**SOLAR TURBINES, INC., Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

No. 53–88C.

United States Claims Court.

May 14, 1991.

Dan Burt, Washington, D.C., for plaintiff.

George M. Beasley, III, with whom were Asst. Atty. Gen. Stuart M. Gerson and David M. Cohen, Director, Washington, D.C., for defendant. Royanne C. Bailey, Sharon Hershkowitz, and Millicent M. Gompertz, U.S. Naval Sea Systems Command, of counsel.

## OPINION

ANDEWELT, Judge.

In this government contract action filed pursuant to the Contract Disputes Act (CDA), 41 U.S.C. § 601, *et seq.*, plaintiff, Solar Turbines, Inc. (Solar), seeks to recover costs and damages arising out of a contract with the Department of the Navy (the Navy). This case is presently before the court on defendant's motion for summary judgment. For the reasons set forth below, defendant's motion is granted in part and denied in part.

I.

The contract in dispute involves the design and production of a Rankine Cycle Energy Recovery (RACER) system for use on Navy gas-turbine powered ships. The RACER system uses waste heat recovered from gas turbine engines to drive a steam turbine. Through the capture and use of waste energy, the RACER system potentially can increase fuel efficiency and thereby increase the distance a ship can travel before having to refuel.

As originally awarded on September 30, 1981, the RACER contract (No. N00024–81–C–5340) was limited to the preliminary design of a RACER system. The contract subsequently was modified, however, to provide for full-scale engineering development, including designing, building, and testing RACER prototypes.

Congress placed the RACER project on an accelerated development schedule with the intent of using the RACER system on the new Burke class guided missile destroyer (the DDG–51 class) that was then being designed. By October 19, 1984, the RACER contract had been modified approximately 34 times. The numerous changes to the contract scope significantly increased Solar's total estimated cost for completing the contract work.

On December 28, 1984, Solar and the Navy entered into a "Memorandum of Understanding" (MOU), involving a series of additional modifications to the RACER contract. The parties agreed to convert the existing cost-plus-award fee contract into a cost-reimbursement contract with a $55 million limitation on government liability. In addition, the MOU provided that Solar would "design, fabricate, test and deliver three RACER units [Units # 1, # 2, and # 3]." The MOU further provided that "the understandings of the parties ... will be included in a formal contract modification."

In April 1985, the parties entered such a formal contract modification on Standard Form 30 (SF 30). The modification, referred to in the documents and briefs as the P00037 modification, contained the $55 million ceiling and specified the obligations with respect to the three RACER units outlined in the MOU. *Inter alia*, the P00037 modification also granted the Navy an unpriced option to have Solar design and manufacture two additional RACER units (Units # 4 and # 5).

By November 1985, Solar's costs on the RACER project approached the $55 million ceiling. In early November, Peter Carroll, Solar's vice president, had a series of meetings with Navy personnel. Following these meetings, on November 8, 1985, Solar notified the Naval Sea Systems Command (NAVSEA) in writing that it expected to have incurred $55 million in costs under the contract by November 18, 1985. Ultimately, Solar received the full $55 million in payments.

Thereafter, Solar continued work on the RACER project. In early 1986, Solar requested additional funds to cover the costs it had incurred above $55 million. The parties engaged in negotiations during April 1986, and on April 24, a senior Solar official and a Navy officer initialed a "Proposed Mutual Termination Modification" (PMTM). The PMTM provided that Solar would cease all contract work "as of the effective date of this contract modification," except preparation of a settlement proposal under the termination clause of

the contract. That settlement proposal would include, *inter alia*, costs that Solar incurred prior and subsequent to the effective date of the P00037 modification. The $55 million limitation would not bar payment of such costs if the costs were found otherwise to be valid either by the contracting officer or under the disputes procedures of the RACER contract.

The PMTM was never included in a formal contract modification. After negotiations failed, on May 8, 1986, 14 days after the initialing of the PMTM, David Boyer, the Navy's procurement contracting officer, unilaterally terminated the RACER contract for convenience of the government. The termination letter took the position that pursuant to the P00037 modification, the Navy's total liability under the contract, including liability for termination for convenience, was limited to $55 million. Thereafter, plaintiff filed a claim with the termination contracting officer in which it sought payments in excess of the $55 million ceiling. After its claim was denied, plaintiff filed the instant eight-count complaint. Defendant moves for summary judgment on each of the eight counts.

## II.

The grant of summary judgment is appropriate where there is an absence of a genuine issue of fact and the moving party is entitled to judgment as a matter of law. RUSCC 56. Summary judgment is not "a disfavored procedural short cut, but rather ... an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1). *See also, Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed.Cir.1987). The summary judgment procedures of RUSCC 56, like their counterpart in Rule 56 of the Federal Rules of Civil Procedure, are designed to protect the legitimate interests of all parties to a law suit by permitting the efficient disposition of claims that lack a

sufficient basis. *See Celotex*, 477 U.S. at 327, 106 S.Ct. at 2555.

■ Under summary judgment procedures, the moving party has the burden of establishing the absence of any genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60, 90 S.Ct. 1598, 1609–10, 26 L.Ed.2d 142 (1970); *see Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987). The moving party can initially discharge this burden by demonstrating an absence of evidence to support the nonmoving party's case, *i.e.*, the absence of evidence as to an essential element of the cause of action on which the nonmovant bears the burden of proof. *Celotex*, 477 U.S. at 322–25, 106 S.Ct. at 2552–53. When the moving party successfully discharges its initial burden in this way, the nonmovant cannot defeat summary judgment merely by alleging a dispute as to a material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Rather, the nonmovant must present sufficient evidence as to the existence of that fact so that the trier of fact could reasonably find in the nonmoving party's favor as to that fact. *Id.* "The non-movant may not rest on its conclusory pleadings but, under Rule 56, must set out, usually in an affidavit by one with knowledge of specific facts, what specific evidence could be offered at trial." *Sweats Fashions*, 833 F.2d at 1562–63 (quoting *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626–27 (Fed.Cir.1984)).

### III.

Plaintiff presents a series of independent arguments to the effect that it is entitled to costs above the $55 million ceiling. Plaintiff's first argument was presented for the first time in its response to defendant's motion for summary judgment. Plaintiff did not specifically make the argument either in its 330–page termination settlement proposal to the contracting officer or in the instant complaint.

This argument involves an issue of contract interpretation. Plaintiff contends that both the MOU and the P00037 modifi-cation provide that if the Navy terminates the RACER contract prior to conducting 4,500 hours of at-sea testing of RACER Unit # 3, the Navy is obliged to pay all of Solar's costs, including costs above the $55 million contract ceiling. Upon analysis, however, neither the MOU nor the P00037 modification creates any such obligation. The RACER contract contains a standard termination for convenience clause which permits the government to terminate the contract, in whole or in part, "whenever for any reason the Contracting Officer shall determine that such termination is in the best interest of the Government." Neither the MOU nor the P00037 modification affects the Navy's right thereunder to terminate the contract at any time or links the exercise of that right to an elimination of the $55 million limitation on government liability.

### *The MOU*

The purpose of the MOU is explained in its two-paragraph preamble, which provides:

> This is a Memorandum of Understanding between [Solar] and the Navy relative to the total RACER Development Program. Solar and the Navy have met and discussed the technical approach to accomplish the main Navy technical objectives of that portion of the program to be included within the ongoing contract ... with an effective utilization of hardware under the ceiling price of $55,-000,000.

> The following technical task statements, assumptions, schedules, and related specifications are agreed to form the basis of Solar's participation in this total program. To that end, the Solar–Navy contract ... will be modified as to its statement of work and deliverables, as described below, into a cost-reimbursement contract with a limitation of Government liability (ceiling) of $55,000,-000. In addition, further Solar efforts will be contracted to accomplish requirements necessary to support the land-based and at-sea testing of Units # 1, # 2 and # 3 (as appropriate), necessary to

obtain approval for limited production of RACER units.

There is no statement in the MOU that specifically restricts the government's right to terminate the contract at any time or links the government's exercise of that right to the $55 million ceiling. Plaintiff contends, however, that such an intent should be implied. Plaintiff relies upon numbered paragraph 3 of the MOU which, under the heading "Solar will design, fabricate, test and deliver three RACER units," discusses in subparagraphs (a), (b), and (c), respectively, Solar's work on Units # 1, # 2, and # 3. Plaintiff focuses on subparagraph (c), set forth below, and, more specifically, the underscored sentence.

 c. Unit # 3 shall be the pre-production configuration baseline unit to be used for at-sea testing. Design deficiencies uncovered by land based, shock or up to 4500 hours of Navy at-sea testing, that prevent meeting performance or threshold parameters will be redesigned and fitted into Unit # 3 as Solar's responsibility. <u>If the system fails after 4500 hours of Navy at-sea testing, the Navy has the option to cease testing and terminate any existing contract for convenience of the government.</u> Solar shall deliver Unit # 3 ready for installation on CALLAGHAN to NNSY by 1 August, 1986. MIL-STD-480A will be imposed on this unit at the completion of 1000 hours of contractor at-sea testing. Solar is to participate fully in CALLAGHAN at-sea and LBTS TECHEVAL test planning, ILS LSA and R & M evolution. A separate contract will be issued for these items, and for technical representative services, spare parts and Navy initiated design changes not resulting from performance or prescribed threshold deficiencies. The test will include whatever tests the Navy, including OPTEVFOR, deems necessary to demonstrate the preventive and corrective maintenance thresholds plus the 3000 hour MTBF at a 90% confidence level. The test will run beyond the 6000 hours previ-

ously discussed, however, in order to meet the DDG–58 requirements, a production decision will be made earlier during the CALLAGHAN test. During the at-sea reliability test preventive and corrective maintenance times will be logged and counted in final verification of the 4 hour MTTR and the 50 MMH/WK thresholds.

(Emphasis added.)

■ Plaintiff argues that since the underscored sentence in subparagraph (c) indicates the Navy may terminate the contract after 4,500 hours of at-sea testing, it impliedly extinguishes the government's right to terminate before 4,500 hours without waiving the $55 million ceiling. But such an interpretation is not reasonable when the underscored sentence is placed in the proper context.

In pertinent part, subparagraph (c) deals with fiscal responsibility for redesigning Unit # 3 in the event test results indicate redesigning is necessary. The sentence preceding the underscored portion indicates that design deficiencies that are uncovered during the first 4,500 hours of testing will be Solar's responsibility ("Design deficiencies uncovered ... up to 4500 hours ... will be ... Solar's responsibility"). The underscored sentence concerns responsibilities for system failures that are uncovered after 4,500 hours of testing ("If the system fails after 4,500 hours"). This sentence explains, in effect, that the Navy is not necessarily obliged to address such failures and may instead terminate the contract for convenience. The sentence does not state that the government's authority to terminate for convenience at any time (including any time before or during the initial 4,500 hours of testing) is in any way modified. Nor does the sentence mention the $55 million ceiling, much less link Navy testing to the enforceability of that ceiling.

Plaintiff contends, in effect, that to interpret the underscored sentence as not preventing termination for convenience prior to 4,500 hours of testing without waiving the $55 million ceiling would render the sentence redundant because prior to the

execution of the MOU, defendant had the authority under the termination clause to terminate the contract for convenience at any time. Plaintiff stresses that a contract should be interpreted to give effect to each of its provisions. *Moyer v. Walker*, 276 F.2d 681, 683 (10th Cir.1960).

In response, first, redundancy would not be unexpected here. Subparagraph (c) spells out fiscal responsibility for problems uncovered in Unit # 3. It would not be unexpected in that context for the government's right to terminate the contract to be specifically mentioned as an alternative to the Navy financing repairs on a failed RACER system. Second, in any event, the underscored sentence is not redundant in that it does more than simply reiterate the Navy's right under the termination clause to terminate the *RACER* contract for convenience. The preamble to the MOU, quoted above, anticipates that the parties may enter other contracts ("further Solar efforts will be contracted"), and subparagraph (c) specifically anticipates that "a separate contract will be issued" to cover certain items. The underscored sentence authorizes termination of *"any* existing contract" (emphasis added) and thereby, for the first time, specifies the government's right to terminate for convenience any such *additional* contracts.

### The P00037 Modification

■ The MOU specifically acknowledges that it constitutes merely an understanding between the parties and is not a formal modification of the RACER contract.[1] The actual amendment to the contract was accomplished in the P00037 modification, which includes the same basic understandings articulated in the MOU. An analysis of the P00037 modification's provisions yields the same conclusion as was reached with respect to the MOU, *i.e.,* that the Navy could terminate the RACER contract for convenience prior to completing 4,500 hours of testing without affecting the $55 million ceiling on government liability.

Testing of the RACER units is covered, in pertinent part, in clause H–21 of the P00037 modification. The title and preamble of clause H–21 indicate that it addresses *Solar's* responsibilities under the contract:

H–21 Contractor Responsibility.

The contractor's liability for deficiencies ... shall be as set forth below....
Paralleling the equivalent provision of the MOU, clause H–21 contains subsections (a), (b), and (c), which cover the production of RACER Units # 1, # 2, and # 3, respectively. As to Unit # 3, similar to the MOU, subsection (c) provides:

The Contractor's period of performance and liability shall, for Unit # 3, extend through completion of 100 hours (approximately) of dockside and sea trial testing and 1000 hours of Contractor at-sea testing plus completion of 4500 hours of Navy at-sea testing aboard the GTS ADM WM. CALLAGHAN.... If the RACER system fails after 4500 hours of Navy at-sea testing, the Government may cease testing and terminate this or any other RACER-related contract for the convenience of the Government.... Nothing in this Clause voids or in any way restricts the right of the Government to terminate this contract pursuant to the provision of Clause 13 of the General Provisions hereof entitled "Termination (1973 APR)."

Thus, as was the case with the analogous subparagraph (c) of the MOU, the wording in subsection (c) of clause H–21 neither specifies nor suggests any intent either to modify the government's right to terminate the contract at any time or to link the $55 million ceiling to the government's completion of 4,500 hours of testing.

Indeed, the government's liability in the event of such a termination is the subject of separate clause H–20 of the P00037 modification. Clause H–20, entitled "Ceiling Amount," unequivocally provides that the government's liability under the contract shall not exceed $55 million. Subsection (a)

---

1. The MOU provides, in pertinent part: "This document describes the understandings of the parties with respect to the requirements to be satisfied under the [RACER contract] and will be included in a formal contract modification."

of clause H–21 states: "It is understood and agreed by the Parties that the total liability of the Government under this contract shall not exceed $55,000,000.... [T]he Contractor will bear 100% of all costs which ... cause the total costs and fee to exceed $55,000,000...."

Subsection (b) of clause H–21 gives the contractor two options if its costs for meeting the requirements of the contract exceed $55 million. The contractor can (1) "continu[e] performance totally at its own expense" or (2) "request[ ] the Government to terminate the contract for the convenience of the Government," with which request the government is obliged to comply. Subsection (b) further explains that the $55 million ceiling applies in the event of a termination for convenience regardless of which party institutes the termination.

> Nothing in this clause in any way restricts the Government's right to terminate this contract pursuant to the "Termination" clause of the contract. *In the event of termination, whether initiated at the Contractor's request or otherwise, it is understood and agreed that the Government's total liability shall not exceed $55,000,000.*

(Emphasis added.)

Hence, the pertinent contract terms are not ambiguous. The termination clause, contained in the original contract, permitted the government to terminate the contract at any time, and that clause was never amended through a contract modification. The MOU and the P00037 modification each contains a $55 million ceiling on government liability under the contract. That ceiling is binding and is not linked in any way to the timing of any termination for convenience.[2]

To support its contrary contention, plaintiff presents a declaration of John Hanson, Solar's president, who was involved in the negotiations of the MOU. Therein, Hanson stated that it was his understanding "that the Navy could not terminate the RACER contract, absent cause, before it tested RACER unit No. 3 for 4500 hours, unless it paid Solar's costs up to the time of termination." If indeed this was Solar's view, it is not understandable why there is no mention of such an understanding in plaintiff's 330–page termination proposal or in any of the many contemporary documents that have been presented to this court. In any event, however, this court need not assess the proper weight to be given to the affidavit because the parol evidence rule precludes evidence of the parties' intent in situations such as this where the contract is unambiguous. *Beta Systems, Inc. v. United States,* 838 F.2d 1179, 1183 (Fed.Cir.1988); *SCM Corp. v. United States,* 230 Ct.Cl. 199, 206, 675 F.2d 280, 284 (1982). Defendant therefore would be entitled to summary judgment on plaintiff's new claim if plaintiff were to amend its complaint to include an allegation that the $55 million ceiling did not apply because the government terminated the contract for convenience prior to 4,500 hours of testing.

## IV.

Plaintiff next presents the alternative argument that the PMTM, initialled by representatives of each party, is a binding agreement which waives the $55 million ceiling on government liability contained in the P00037 modification. To establish the existence of an express contract with the government, a party generally must demonstrate (1) a mutual intent to contract

---

**2.** Plaintiff contends that the court's interpretation of the P00037 modification renders the modification unenforceable because it results in a lack of consideration passing to plaintiff. But the nature of the consideration passing to plaintiff is apparent from the terms of the P00037 modification. The "whereas" clauses in the P00037 modification state that in May 1984 and subsequent thereto, Solar had projected increases in the estimated cost of performance of the contract and that the government had not planned for such extensive increases. At that time, the government had already funded a total amount of $43,968,764 for estimated costs. The final "whereas" clause provides that "the government is willing to provide further funding in the amount of $9,009,238.00." This promise to provide further funding under the contract constitutes consideration. Moreover, the government fulfilled its promise and plaintiff received that further funding.

(including an offer, acceptance, and consideration), (2) a lack of ambiguity in the offer and acceptance, and (3) authority to contract on the part of the government agent. *Russell Corp. v. United States,* 210 Ct.Cl. 596, 608–09, 537 F.2d 474, 482, *cert. denied,* 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977). Relying on the provisions of the Federal Acquisition Regulations (FAR), defendant contends that a fourth prerequisite exists where, as here, the purported agreement involves a modification of an existing government contract covered by the FAR. That fourth prerequisite is that the modification be incorporated on an SF 30. In its summary judgment motion, defendant contends that none of these purported prerequisites for a binding contract modification exists here.

### A.

Turning first to the three prerequisites set forth in *Russell,* the evidence submitted by the parties indicates that not even plaintiff viewed the PMTM as a binding agreement. First, after the PMTM was initialed, plaintiff prepared and sent to the Navy a series of draft mutual termination agreements. The preparation of such drafts is inconsistent with a belief that the parties had already reached an agreement. Next, in a July 7, 1986, letter to Congress, approximately eleven weeks after the April 24 PMTM was initialed, Solar informed Congress that it had been unable to reach "a meeting of the minds with the Navy" and that "no agreement has been realized." Finally, the PMTM differs in form from all the other modifications of the RACER contract, *inter alia,* in that it (1) uses the term "proposed" in its title, (2) contains the initials rather than the full signatures of representatives of the parties, (3) was not signed by a contracting officer, and (4) was not incorporated on an SF 30.

Of course, in response to a proper summary judgment motion, the nonmoving party need not prove the material fact allegedly in dispute. Rather, it must only present sufficient evidence as to the existence of that fact to permit a trier of fact reasonably to find in the nonparty's favor as to that fact. *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. In any event, however, even assuming plaintiff had presented sufficient evidence to withstand summary judgment as to its own intent to enter a binding agreement, such evidence is not sufficient to defeat defendant's motion for summary judgment because, as discussed above, a binding agreement requires a *mutual* intent to contract. On the issue of the Navy's intent, defendant has presented compelling evidence that the Navy never intended the PMTM to constitute a binding modification of the RACER contract. Plaintiff's response does not present sufficient evidence to defeat summary judgment on this issue.

There were four pertinent Navy officials involved in the PMTM process: Admiral William H. Rowden, Commander of NAVSEA; David L. Boyer, a contracting officer within NAVSEA; Captain Brian T. Perkinson, Director of the Destroyer Division, AEGIS Shipbuilding Program; and Melvyn R. Paisley, Assistant Secretary for Research, Engineering, and Systems. Both Rowden and Boyer apparently were contracting officers; Perkinson and Paisley were not.

The PMTM resulted from a March 17, 1986, meeting between Admiral Rowden and Peter Carroll, vice president of Solar. In an affidavit defendant presents to support its motion for summary judgment, Admiral Rowden states, in effect, that he did not believe that he reached a final binding agreement at the March 17 meeting to eliminate the $55 million cap on government liability. Rowden states therein that at that meeting, he "informally agreed" to "general guidelines." He further states that it was his policy that "contracting actions only become effective upon the execution of formal contract documents" and that he "never exercised [his] contracting authority informally nor did [he] sign contracts or modifications." Instead, he "left that function to the designated program contracting officer."

After the March 17 meeting, Rowden had Perkinson conduct negotiations with Solar. Perkinson testified during his deposition

that he told a Solar representative that the reason he was initialing the PMTM was that he was not a contracting officer, did not have contracting authority, and could not commit the government. Boyer, who did have contracting authority and was present at the time Perkinson initialed the PMTM, testified during his deposition that he refused to initial the PMTM because it could be interpreted to break the $55 million ceiling for work performed under the contract and he opposed breaking the ceiling.

The Rowden affidavit also disputes any intent on his part to ratify the PMTM after it was initialed by Perkinson. Admiral Rowden states that he did not authorize Perkinson "or anyone else ... to make a binding commitment with Solar without further consultation with [him]." He further explains:

> I did not intend for the [PMTM] to become a binding legal document until it had been signed by the designated contracting officer.... I turned the matter over to the program office ... and the NAVSEA Contracts Directorate ... to work out a memorandum of understanding to be signed by the contracting officer after consultation with me.

Admiral Rowden sent the PMTM, together with a memorandum, to Assistant Secretary Paisley. When the memorandum was returned, it was marked "approved" with a caveat to the effect that the PMTM should be clarified to assure that the $55 million ceiling continued to apply to costs incurred for work required to be performed under the P00037 modification. In his affidavit, Rowden states that he agreed that the PMTM should not become final and requested that the contracting officer resume negotiations. Rowden further states that

he fully agreed with the contracting officer's decision to terminate the RACER contract unilaterally when the parties were unable to resolve the issue of the ceiling's applicability.

 The Rowden affidavit and related deposition testimony demand a conclusion that each of the three prerequisites set forth in *Russell* is absent here. The evidence cited by defendant indicates that the Navy never possessed the intent required to produce a binding agreement to alter the $55 million ceiling and never agreed to precise terms to be included in any such agreement.[3] Moreover, no one with authority to bind the Navy in contract (*i.e.*, Rowden or Boyer) entered into an agreement, delegated authority to enter into an agreement, or ratified any agreement that would eliminate the $55 million ceiling on government liability.

Plaintiff's response to defendant's motion for summary judgment, which includes an eight-part appendix containing in excess of 3,000 pages of documents and deposition testimony, does not support a contrary conclusion. This evidence clearly supports a conclusion that certain individuals within the Navy, including Admiral Rowden, at least for some period of time were of the opinion that the Navy should be willing to pay some costs above the $55 million ceiling in order to secure a mutual termination agreement. The evidence also arguably supports a conclusion that Admiral Rowden and others anticipated that the Navy ultimately would enter a binding mutual termination agreement to that effect. Indeed, Rowden started negotiations toward that end. But while the evidence shows an intent on the part of some Navy officials to enter an agreement in the future, the evidence does not support a conclusion that

---

**3.** The government makes the alternative argument that even if both parties had intended the PMTM to be a binding contract, it would not be legally binding because there was no consideration passing to the government in the PMTM. Defendant argues, in effect, that the government did not receive anything of value from plaintiff under the PMTM that it could not have secured through unilateral termination pursuant to the termination for convenience clause. But the government clearly would receive something of

additional value if the PMTM were binding, *i.e.*, Solar's agreement that the contract should be terminated. As described *infra*, the Navy had an ongoing conflict with Congress because it was far less inclined than Congress to proceed with RACER development. One factor that apparently led to the conflict was Solar's effective lobbying of Congress. Securing Solar's agreement that the RACER contract should be terminated therefore would be expected to help the Navy resolve its dispute with Congress.

any responsible Navy officials believed that the Navy had already committed itself to specific terms and entered a binding mutual termination agreement that modified the $55 million ceiling. Plaintiff's evidence is completely consistent with Admiral Rowden's statements in his affidavit to the effect that at the March 17, 1986, meeting, the parties "informally agreed" to "general guidelines" and that actual mutual termination would have to await the negotiation of final terms and the signing of the agreement by an authorized contracting officer.

### B.

Turning to the purported fourth prerequisite that any contract modification must be incorporated on an SF 30, defendant bases its argument as to the existence of such a prerequisite on the Federal Acquisition Regulations and cases interpreting them. *See, e.g., Mil–Spec Contractors, Inc. v. United States*, 835 F.2d 865 (Fed. Cir.1987); *Texas Instruments, Inc. v. United States*, No. 90–1194, slip op. (Fed. Cir. Mar. 19, 1991), *clarifying* 922 F.2d 810 (Fed.Cir.1990). FAR 43.301, entitled "Use of forms," provides that an SF 30 "shall" be used for "supplemental agreements." [4] FAR 43.103, entitled "Types of contract modifications," states that a bilateral modification of a contract is a "supplemental agreement" and, in addition, that a bilateral modification "is signed by the contractor and the contracting officer." [5] In *Mil–Spec*, the Court of Appeals for the Federal Circuit reviewed these FAR provisions and concluded that (1) "any bilateral modification of a contract is a 'supplemental agreement,' which requires the execution of a written standard form 30," 835 F.2d at 868, and (2) "[u]nless and until there was a

binding modification to which both [the contractor] and the contracting officer had agreed in writing, there could not be a binding modification of the contract." *Id.* at 867. Defendant contends that summary judgment is warranted here on this purported fourth prerequisite because the PMTM was never incorporated on an SF 30 and, in any event, was not signed by the contracting officer. The PMTM was in writing but it was initialed rather than signed by Perkinson, and Perkinson was not a contracting officer.

 Clearly, if the PMTM were an agreement between the parties, it would be a "supplemental agreement" under the FAR because it "would have altered or modified the existing contract." *Texas Instruments*, No. 90–1194, slip op. at 2. Plaintiff argues, however, that the FAR should be interpreted only to require that such a supplemental agreement be in writing and here, the PMTM was in writing. But in stating that "any bilateral modification is a 'supplemental agreement,' which *requires* the execution of a written standard form 30," 835 F.2d at 868 (emphasis added), the *Mil–Spec* court arguably concluded to the contrary, *i.e.*, it arguably interpreted the FAR requirement that an SF 30 "shall" be used as setting a condition precedent to any bilateral modification being binding. In any event, however, even if the completion of an SF 30 is not a prerequisite to a binding bilateral modification, the definition of "bilateral modification" in FAR 43.103 would appear to require that in order to be binding, the agreement at least must be signed by the contracting officer ("A bilateral modification (supplemental agreement) *is* a contract

---

**4.** 48 C.F.R. § 43.301 (1989) provides, in pertinent part:

> (a)(1) The Standard Form 30 (SF 30), Amendment of Solicitation/Modification of Contract, shall [with inapplicable exceptions] be used for—
>
> * * * * * *
>
> (v) Supplemental agreements (see 43.103).

**5.** 48 C.F.R. § 43.103 (1989) provides, in pertinent part:

> Contract modifications are of the following types:

> (a) *Bilateral.* A bilateral modification (supplemental agreement) is a contract modification that is signed by the contractor and the contracting officer. Bilateral modifications are used to—
> (1) Make negotiated equitable adjustments resulting from the issuance of a change order;
> (2) Definitize letter contracts; and
> (3) Reflect other agreements of the parties modifying the terms of contracts.
> (b) *Unilateral.*

modification that is signed by the contractor and the contracting officer" (emphasis added)). As explained above, Perkinson, who initialed the PMTM, was not a contracting officer.

In sum, defendant's motion for summary judgment is sufficient to demonstrate the absence of a genuine issue as to a material fact concerning plaintiff's contention that the PMTM is a binding agreement which waives the $55 million ceiling on government liability. In its response, plaintiff has failed to satisfy its legal burden to present sufficient evidence of a genuine issue as to a material fact.[6] Accordingly, Count II of plaintiff's complaint is dismissed.

## V.

Next, plaintiff contends that even if the PMTM was not a binding agreement, the $55 million ceiling is nevertheless unenforceable because it was waived by the Navy.

A waiver is an intentional relinquishment of a known right. *Blacks Law Dictionary* 1580 (6th ed. 1990); *see, e.g., Cherokee Nation v. United States*, 174 Ct.Cl. 131, 355 F.2d 945 (1966). Herein, the RACER contract as modified not only contained a $55 million ceiling on Navy liability but also, as explained above, incorporated provisions which permitted bilateral and unilateral modification of the contract only upon satisfaction of certain prerequisites. *See* FAR 43.301 and 43.103. Plaintiff's argument therefore is, in effect, that the Navy intentionally relinquished its right to rely on these prerequisites and its right generally to limit its liability under the contract to $55 million. But the same evidence that resulted in the grant of summary judgment above on plaintiff's claim that the parties entered a binding contract to eliminate the ceiling is also fatal to plaintiff's claim that the Navy intentionally relinquished these rights.

That evidence, summarized above, indicates that the Navy viewed modification of the $55 million ceiling as a contract issue to be resolved, if at all, on the basis of bilateral negotiations aimed at reaching a final mutual termination agreement. There is no significant evidence suggesting that the Navy intended to relinquish its right under the contract to enforce the ceiling other than through the formal contract modification process. For example, Rowden operated under the policy that "contracting actions only become effective upon the execution of formal contract documents." He did not enter any modification and the evidence does not support a conclusion that he intended by his actions to relinquish any contract right. Perkinson and Boyer also had no such intention. Indeed, Perkinson initialed the PMTM precisely because he could not bind the government and Boyer, who could bind the government, refused to initial it.

As was the case with respect to the allegation that a binding contract existed, the evidence upon which plaintiff relies to support its waiver theory shows nothing more than that certain individuals within the Navy were willing, at least at certain times, to grant Solar some costs above the $55 million ceiling in order to secure a bilateral agreement terminating the RACER contract. That evidence does not show any intent by the Navy to relinquish the $55 million ceiling other than based upon a bilateral mutual termination agreement. Therefore, plaintiff's evidence is not sufficient to satisfy its burden in response to defendant's properly supported motion for summary judgment on the waiver issue. Count III of plaintiff's complaint is therefore dismissed.

## VI.

The complaint contains a series of other counts which present alternative legal theories under which the Navy would be pre-

6. In its brief, plaintiff also contends that there existed an implied-in-fact contract waiving the $55 million ceiling. But an implied-in-fact contract generally requires the same showing of a mutual intent to contract as an express contract.

*Pacific Gas & Electric Co. v. United States,* 3 Cl.Ct. 329, 338–39 (1983). For the reasons set forth above, plaintiff has not made that showing here.

cluded from relying upon the $55 million ceiling. Many of these counts are variations of a single theme—that the Navy acted in bad faith by engaging in deceptive and intentionally misleading conduct.

### A.

To understand the allegations of bad faith, it is necessary to place the negotiations aimed at securing a mutual termination agreement in a broader factual context. The Navy is not free to make all of its own procurement decisions. As with other executive agencies, the Navy is subject to the congressional appropriations process. In certain instances, Congress simply appropriates funds and gives the Navy broad discretion as to how to use those funds. In other situations, such as the instant case, Congress becomes intimately involved in the details of Navy procurement decisions.

The precise cause of congressional interest in the RACER project is the subject of some dispute. Defendant suggests, in effect, that congressional interest was the result of Solar spending considerable time and effort lobbying Congress and key congressional staffers to force the Navy to continue to support a RACER project that the Navy did not want. Plaintiff contends, in effect, that congressional interest was simply the result of congressional concern that the Navy build the best ships possible. These two explanations are not necessarily inconsistent. In any event, however, it is not necessary to assess the precise cause of congressional interest. The important point is that Congress was involved and was putting significant pressure on the Navy to fund the RACER project and to use the RACER technology on the DDG–51 class ships.

The congressional authorizations for Fiscal Years (FY) 1984 and 1985 demonstrate this pressure. For FY 1984, Congress au-

thorized the Navy to spend approximately $40 million for RACER development, $24 million over the Navy's request. Congress further specified that $24 million of the authorization be directed "to ensure compatibility of the RACER system with all ships of the DDG–51 class, including the lead [*i.e.*, the first] ship." Department of Defense Authorization Act, 1984, Pub.L. No. 98–94, § 203(a)(1), 97 Stat. 614, 623 (1983). For FY 1985, Congress again exceeded the Navy's request and authorized $45 million to be used "only for the continued development of the [RACER] system to ensure compatibility of the RACER system with all ships of the DDG–51 class, including the lead ship." Department of Defense Authorization Act, 1985, Pub.L. No. 98–525, § 203(a)(1), 98 Stat. 2492, 2508 (1984). In addition, in the 1985 authorization Congress sought to tie the Navy's ability to continue development of the DDG–51 class of ships to the Navy's development of RACER technology for use on that class. Congress prohibited the Navy from obligating or spending any of the $1.1739 billion Congress authorized to build the DDG–51 class in FY 1985 "until the Secretary of the Navy certifie[d] to [Congress] that the lead ship in that program is capable of being equipped with a [RACER] system without rearrangement of the ship spaces and equipment or other major modification to the ship." *Id.*, § 102(h) at 2501.[7]

While congressional pressure to employ RACER technology in the DDG–51 class ships was apparently steady or increasing, enthusiasm for RACER within the Navy apparently was decreasing, at least from the perspective of certain Navy officials. There was concern, *inter alia*, both with the costs and the efficacy of the RACER technology. In addition, Admiral Watkins, the Chief of Naval Operation, had apparently issued a directive to the Surface Warfare Division to "get steam off of ships,"

---

7. John Lehman, Secretary of the Navy, provided a certification on December 21, 1984. That certification states that "the lead ship *will be capable* of being equipped with a [RACER system] without rearrangement of ship spaces and equipment or other major modification to the ship" (emphasis added). Although the language

used by Lehman indicates a future, rather than present, capability of equipping the lead ship with a RACER system, the Comptroller General compared the statutory language with the language used in Secretary Lehman's certification letter and concluded that the letter satisfied the certification requirement.

and the RACER system involved the use of steam turbine engines.

Plaintiff's allegation of bad faith involves, *inter alia*, the adoption of a "RACER Strategy" by Navy officials "to kill" the RACER program without causing a confrontation with Congress. This end would be accomplished by inducing Solar itself to request termination of the contract. Plaintiff alleges that even though the Navy had determined not to employ the RACER technology on the DDG–51 class ships, Naval officials engaged in numerous actions aimed at inducing plaintiff to make substantial investments in RACER beyond the $55 million that could be recovered under the contract. For example, plaintiff alleges that Navy officials intentionally misrepresented the Navy's intentions by issuing highly optimistic assessments of future use of a RACER system on DDG–51 or another class of ships. As Solar's investments in RACER increased, plaintiff alleges, Navy personnel believed that Solar's parent company, Caterpillar Tractor Company (Caterpillar), would object and force Solar to request termination of the contract.

 Plaintiff contends that the Navy's bad faith implementation of this purported "RACER Strategy" resulted in a breach of contract under a variety of theories, including, *inter alia*, (1) failure to disclose the Navy's superior knowledge as to the strategy the Navy had developed and its decision not to use a RACER system (Count I), (2) misrepresentations by the Navy concerning its intent to employ the RACER technology and use a RACER system on the DDG–51 lead ship (Count IV), (3) breach of a warranty that the Navy would use a RACER system if Solar successfully developed it (Count V), (4) breach of an implied covenant to deal in good faith (Count VIII), (5) bad faith termination of the contract, and (6) equitable estoppel. Since all of the theories turn on essentially the same factual allegations and would involve essentially the same proof at trial, the court at this time will not engage in a lengthy analysis of the legal prerequisites under each theory. Rather, it is appropriate to resolve the fundamental issue of whether plaintiff's allegations of bad faith are sufficient to survive summary judgment under any theory. The court concludes that they are.

The internal documents clearly show that Navy officials were extremely concerned with congressional pressure to employ a RACER system. That pressure left the Navy "tied up in knots" and "in a box." The pressure presented the Navy with "a challenge." "[The Navy] need[ed] a strategy on how to proceed." Ultimately, a memorandum, entitled "Racer Strategy," was written and circulated. That memorandum appears to focus, in part, on Solar's vulnerability to Caterpillar deciding to terminate the RACER project. It provides, in pertinent part:

> Encourage Solar to talk with other people in Washington but do not make any changes to the current contract or create any additional contracts. Solar is working on their own funds and corporate may soon put pressure on them to stop the development of a system the Navy does not desire to put on a ship.

The memorandum also proposed, but ultimately rejected, a seemingly unsavory response to congressional pressure which involved the Navy first spending millions of dollars of government money to redesign the DDG–51 class of ships, and second proceeding "to kill the RACER program on technical, cost and lack of warfighting enhancement issues."

Other evidence also raises at least the possibility that the Navy was "baiting" plaintiff and not dealing in good faith. For example, one internal memorandum reads:

> The strategy that Paisley would like to follow:
>
> Find a ship. I proposed the AOE–6. Tell the Condgress (sic) and Solar that if the RACER proves out we will put it in a "ship."
>
> Tell Solar to complete the testing and give us what we have contracted for. (This will take company money and it is not at all certain that Solar will take the bait.)

Another example is that the Navy sent a letter to Solar demanding Solar's compli-

ance with the contract, even though at least certain Navy officials had already determined to terminate the contract for convenience. Other evidence indicates that certain Navy officials were of the view that other Navy officials were painting an improperly optimistic picture of RACER's future during discussions with Solar personnel.

### B.

■ Every contract, whether the government is a party or not, contains an implied covenant of good faith and fair dealing. *See, e.g., Eliel v. United States,* 18 Cl.Ct. 461, 470 (1989).

> The underlying principle is that there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract; in other words, in every contract there exists an implied covenant of good faith and fair dealing.

5 W. Jaeger, *Williston on Contracts* § 670 (3rd ed. 1961). Here, from plaintiff's perspective, one of the significant fruits of the P00037 modification was plaintiff's ability to force termination of the contract and thereby limit its expenditures when it appeared that sales of RACER units would not be forthcoming. Plaintiff contends that defendant's misrepresentations and general bad faith actions had the effect of destroying this negotiated-for protection.

■ At this point, it is not apparent that plaintiff will be able to demonstrate a breach of the covenant of good faith and fair dealing or government liability under any of the other related theories of bad faith. The evidence plaintiff has submitted to date is relatively sparse and somewhat ambiguous, and benign explanations of actions by Navy personnel may well exist. Moreover, the essence of a bargain between parties to a contract is found in the express provisions of that contract. The implied duty to deal in good faith, therefore, must not be interpreted so broadly as to inhibit a party unreasonably from maximizing its benefits through aggressive enforcement of its contract rights.

■ However, in evaluating a motion for summary judgment, it is necessary to interpret the evidence in the light most beneficial to the nonmoving party. *Adickes,* 398 U.S. at 158–59, 90 S.Ct. at 1608–09. This court has specifically referenced only certain evidence upon which plaintiff relies. When all of the evidence is viewed in the light most favorable to plaintiff, the evidence raises sufficient doubt concerning the Navy's actions as to entitle plaintiff to a trial on the merits of its allegations of bad faith.[8] Defendant's motion for sum-

---

**8.** Defendant makes two other arguments concerning plaintiff's claims of bad faith which merit brief discussion. First, defendant contends that plaintiff should be precluded from contesting defendant's alleged bad faith actions on the grounds of waiver, estoppel, and election. Relying on *Ling–Temco–Vought, Inc. v. United States,* 201 Ct.Cl. 135, 475 F.2d 630 (1973) *(LTV)*, defendant contends that these defenses apply because Solar voluntarily continued to develop a RACER system after it became aware that certain Navy officials did not want to use the system. But part of plaintiff's allegation of bad faith is that plaintiff took the information it had heard about the concerns of Navy personnel to higher Navy officials who assured Solar that, in fact, a RACER system would be used. There is some support in the documents for this position. In this context, unlike *LTV,* the contractor herein could not be said to have continued to perform under the contract with full knowledge of a material breach by the government.

Second, defendant contends that the limitation of cost (LOC) clause in the contract pre-

cludes plaintiff from recovering an award that exceeds the $55 million contract ceiling. The LOC clause provides, in effect, that the government is not obliged to reimburse the contractor for any costs in excess of the estimated cost in the contract unless the contractor notifies the government in a timely manner of the impending overrun and in turn receives a notification from the government that the contract estimate is increased. But contractual provisions such as the LOC clause that set a limit on potential contractor recovery of costs have been interpreted ordinarily not to control where, as here, the contractor alleges that it suffered damages above the limitation as a result of a breach of a contractual duty by the government. *See, e.g., Raymond Constructors of Africa, Ltd. v. United States,* 188 Ct.Cl. 147, 166, 411 F.2d 1227, 1237 (1969); *Breed Corp. v. United States,* 223 Ct.Cl. 702, 650 F.2d 286 (1980), *adopting with modification* 27 CCF ¶ 80,333 (1980).

Moreover, the facts of this case demonstrate that the parties herein would not reasonably have anticipated that the LOC clause would con-

mary judgment is therefore denied to the extent it seeks judgment on the counts that appear to rest on allegations of bad faith (Counts I, IV, V, VII, and VIII).

## VII.

■ In another alternative argument, plaintiff contends that even if the court concludes that defendant's alleged bad faith actions did not constitute a breach of contract, the $55 million ceiling on government liability nevertheless should not be enforced because its enforcement would be contrary to public policy. The public policy issues raised by plaintiff relate to the Navy's interactions with Congress concerning the RACER project.

Plaintiff's first public policy argument is that the Navy used the $55 million ceiling to evade Congress's 1985 spending authorization. The 1985 Authorization Act, adopted on October 19, 1984, authorized $9.4 billion for the Navy for research, development, testing, and evaluation. Of that amount, $45 million was to be used "only for the continued development of the [RACER] system to ensure compatibility ... with all ships of the DDG–51 class, including the lead ship." 1985 Authorization Act, *supra.* Plaintiff interprets this language as obliging the Navy to spend $45 million on RACER during FY 1985 and contends that this obligation was not satisfied because the Navy expended only approximately $23.5 million. Plaintiff blames the shortfall on the $55 million ceiling which was agreed to in the MOU on December 28, 1984, shortly after the enactment of the 1985 Authorization Act. Plaintiff contends that because the $55 million ceiling thwarted Congress's mandate to spend $45 million on the RACER project,

the ceiling is contrary to public policy and should not be enforced.

■ In appropriate cases, courts have refused to enforce a contract that violates established public policy. *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 43, 108 S.Ct. 364, 373, 98 L.Ed.2d 286 (1987). But a court's discretion in this regard is narrowly limited. A court is not free to refuse to enforce a contract based simply on the court's own perception of sound public policy. "Were courts free to refuse to enforce contracts as written on the basis of their own conceptions of the public good, the parties to contracts would be left to guess at the content of their bargains, and the stability of commercial relationships would be jeopardized." *St. Paul Mercury Ins. Co. v. Duke University*, 849 F.2d 133, 135 (4th Cir.1988); *see also Federal Deposit Ins. Corp. v. Aetna Casualty & Surety Co.*, 903 F.2d 1073, 1077 (6th Cir.1990). Rather, a court can properly refuse to enforce a contractual provision only where the contract violates "some explicit public policy" that is "well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *United Paperworkers*, 484 U.S. at 43, 108 S.Ct. at 373 (quoting *W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983), quoting *Muschany v. United States*, 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945)).

While compliance with unambiguous federal statutes would seem to constitute well-defined public policy, here there is no "explicit conflict," *id.*, between the 1985 Authorization Act and the contractual provi-

trol. The LOC clause concerns cost overruns. It establishes procedures that must be followed for the contractor to receive payments under the contract in excess of the estimated cost set forth in the contract. The contractor must make a timely request for an increase in the estimated cost and the government must agree. But the LOC clause does not anticipate that Solar would request an increase in the contract cost prior to spending the funds in issue here. The $55 million ceiling was already part of the contract at that time and neither plaintiff nor defendant viewed plaintiff's expenditures as re-

imbursable under the contract. Indeed, plaintiff intended to profit through future sales of RACER units and not through recovery of additional costs and fees under the contract. Hence, plaintiff is not seeking to recover costs pursuant to the terms of the contract but rather *damages* stemming from the government's alleged bad faith actions aimed at inducing plaintiff to spend in excess of the $55 million contractual limitation. The LOC clause here involved, worded as it is, cannot reasonably be interpreted as addressing the possibility of such a recovery.

sion establishing the $55 million ceiling. First, it is not apparent from the language of the authorization ($45 million "is available only for") that Congress necessarily mandated the Navy to spend all $45 million on the RACER system. Rather, Congress may have merely intended to preclude the Navy from spending that $45 million on any other activities, *i.e.*, the money would be forfeited if not spent on the RACER system. The title of the pertinent section in the 1985 Authorization Act ("Limitation on Funds for the Navy") arguably supports such an interpretation.

Second, in any event, even assuming that the 1985 Authorization Act was interpreted to mandate expenditures of $45 million on RACER, the Act does not specify that the $45 million must be paid to Solar pursuant to the RACER contract. It would be completely consistent with such a mandate for the Navy to negotiate a $55 million ceiling on Solar's RACER contract and then proceed to spend the additional funds necessary to reach the statutory amount on some other effort directed at ensuring compatibility between the RACER system and the DDG–51 class of ships. For example, the government could have spent the money testing the RACER prototype developed by Solar (such testing was anticipated in the contract) or entered additional contracts with Solar (which were anticipated in the P00037 modification), or entered contracts with other contractors.

Therefore, even assuming a binding obligation to spend $45 million existed, the $55 million ceiling is not explicitly or inherently in conflict with that obligation.[9] It was not the $55 million ceiling itself that resulted in any shortfall but rather the Navy's failure to spend sufficient additional monies on the RACER project beyond the monies due to Solar under the RACER contract. In such a situation, the particular contractual provision setting the $55 million limitation on government liability cannot be said to conflict with any "well defined and dominant"

public policy. *Id.* Hence, resort to the very exceptional remedy of refusing to enforce an otherwise valid contract provision is not warranted here.

 Next, in a related argument, plaintiff argues that the $55 million ceiling provision should not be enforced because the Navy used the ceiling to mislead Congress in a manner contrary to public policy. Plaintiff focuses on two actions by the Navy. First, Solar focuses on the Navy's failure to notify Congress that it did not intend to spend the full $45 million on the RACER project during FY 1985. Plaintiff contends that the Navy was legally obliged to send Congress a formal report of a rescission indicating that the funds would be permanently withheld. *See, e.g.*, 2 U.S.C. §§ 681 and 683 (1985). An internal Navy memorandum disputed the need for a formal rescission but recommended that "to ensure good faith compliance with the [Authorization Act]," a letter should be sent informing the Chairman of the Armed Service Committee that the authorized money would not be spent. Plaintiff argues, in effect, that since neither a report of a rescission nor the proposed letter was timely sent, the Navy misled Congress as to its intentions and as a result, the court should refuse to enforce the $55 million ceiling. Second, Solar focuses on the certification signed by Secretary Lehman (*see supra* note 7) and contends that the certification, which indicates that the DDG–51 lead ship "will be capable of being equipped with a [RACER system]," also served to mislead Congress.

But as to both points, the required nexus does not exist between the contractual provision plaintiff asks this court to refuse to enforce and the purported public policy that plaintiff alleges was contravened. The $55 million ceiling does not explicitly conflict with any public policy against misleading Congress. The ceiling does not mandate that Congress be misled or neces-

---

9. Defendant contends that if the 1985 Authorization Act were interpreted as requiring the Navy to change plaintiff's contract or to raise the $55 million ceiling, it would violate the separation of powers doctrine and hence would be uncon-

stitutional. But since the court finds that there is no "explicit conflict" between the $55 million ceiling and the 1985 Authorization Act, it is not necessary to reach this constitutional issue.

sarily have that effect. First, the $55 million ceiling did not result in the Navy failing to notify Congress of the shortfall in expenditures. Certainly, the Navy could have negotiated a $55 million ceiling and then, when it became clear that total expenditures would not reach the authorized amount, the Navy could have informed Congress of that fact in a timely manner. Second, the $55 million ceiling similarly was independent of Secretary Lehman's certification. The provision creating the ceiling did not prevent the Navy from notifying Congress as soon as it became clear that the Secretary would prove incorrect in his representation that the DDG–51 lead ship "will be capable of being equipped with a [RACER system]."

■ Thus, since the contractual provision establishing the $55 million ceiling cannot be said to violate any "explicit public policy," *United Paperworkers*, 484 U.S. at 43, 108 S.Ct. at 373, plaintiff cannot invoke "public policy" as a ground for avoiding the ceiling.[10] A grant of summary judgment on Count VI is therefore appropriate.

## VIII.

■ Plaintiff's request for monetary damages is not limited to the recovery of its costs expended on the RACER development which it would have recovered in the absence of the $55 million ceiling. Plaintiff seeks in addition the profits it allegedly would have received had the RACER system proved satisfactory and the Navy purchased Units # 4 through # 21 for use aboard the DDG–51 class ships.[11]

This court discussed at length plaintiff's claim to such lost profits in its decision of January 31, 1989. *Solar Turbines, Inc. v. United States*, 16 Cl.Ct. 304 (1989). Therein, after discussing the applicable law, the court, in essence, invited a summary judgment motion from defendant because it appeared that profits on future sales were too remote or speculative to qualify as compensable damages. *See, e.g., Olin Jones Sand Co. v. United States*, 225 Ct.Cl. 741, 742 (1980). *Inter alia*, the court stated:

Even assuming Solar's contract was never terminated, a number of circumstances apparently would have had to occur for Solar to have profited from any future contracts. With respect to units 6 through 21, *inter alia*, Solar would have had to develop successfully and test the RACER system, a decision would have had to be made to procure these additional RACER systems in the context of budgetary restraints and alternative competing uses for the funds, and, since the procurement for the future contracts would have been conducted on a competitive basis, Solar would have had to prevail in the bidding for these future contracts. With respect to RACER units 4 and 5, the same set of circumstances would have had to occur, except that since the Navy had an option on units 4 and 5, competitive bidding would not be necessary if the Navy chose to exercise the option. In this context, and absent other facts, it would appear that at the

---

**10.** Defendant presents the alternative argument that plaintiff lacks standing to raise the public policy issues here because these issues relate to the interaction between the Navy and a third party, *i.e.*, Congress, and do not directly involve rights that plaintiff claims under the contract. But the doctrine that a court may refuse to enforce contracts that violate public policy is based on the protection of the public interest generally, rather than protection of the particular contract parties. As explained in *United Paperworkers*, 484 U.S. at 42, 108 S.Ct. at 373:

That doctrine derives from the basic notion that no court will lend its aid to one who founds a cause of action upon an immoral or illegal act, and is further justified by the observation that the public's interests in confining the scope of private agreements to which

it is not a party will go unrepresented unless the judiciary takes account of those interests when it considers whether to enforce such agreements. *E.g., McMullen v. Hoffman*, 174 U.S. 639, 654–55 [19 S.Ct. 839, 845, 43 L.Ed. 1117] (1899); *Twin City Pipe Line Co. v. Harding Glass Co.*, 283 U.S. 353, 356–58 [51 S.Ct. 476, 477–78, 75 L.Ed. 1112] (1931).

**11.** While the complaint does not specifically so allege, plaintiff contends that it also is entitled to $21 million of additional damages to cover the commercial value of the 4,500 hours of testing that the Navy was required to perform under the contract. But, as explained above, this court disagrees with plaintiff's interpretation that the contract obliged defendant to conduct such testing.

time of the agreement, profits from these future contracts would be speculative and remote rather than foreseeable and direct and, hence, could not be awarded.

*Id.* 16 Cl.Ct. at 317.

Plaintiff has not presented evidence as to any fact that would support changing the characterization of such damages from speculative and remote to foreseeable and direct. There are simply too many highly uncertain circumstances that would have had to occur before the Navy would have ordered Units # 4 through # 21 from Solar.[12]

Moreover, it should be noted that plaintiff's basic argument as to the Navy's bad faith adoption of the "RACER Strategy" is essentially inconsistent with its contention that future RACER sales were foreseeable. As explained above, plaintiff faults the Navy for inducing plaintiff to continue to expend funds on the RACER project even though the Navy had decided not to employ RACER on the DDG–51 class of ships. If the Navy had in fact determined not to employ the RACER system, then it is difficult to characterize future sales of Units # 4 through # 21 as foreseeable. Certainly, the evidence presented does not support the prediction that Navy decisionmakers would have changed their minds. Congress perhaps could have forced the Navy decision-makers to purchase the units. But the evidence before the court does not support a prediction that all tests would have been completed successfully and that Congress would have forced such a purchase over the continued objections of Navy officials.

Indeed, if Solar had sufficient backing in Congress to force the Navy to use the RACER system over the Navy's objections, Solar presumably could have used that influence to force the Navy to continue RACER development instead of terminating the contract for convenience. In this regard, it must be stressed that the alleged "RACER Strategy," which sought to avoid a confrontation with Congress by inducing Caterpillar to force termination of the contract, ultimately was not successful to the extent that Caterpillar and Solar never acquiesced in the termination. Therefore, upon hearing of the proposed termination, Solar was in a position to use whatever persuasive power it had with Congress to prevent the termination and force the Navy to employ the RACER system.

Thus, even interpreting the evidence in the light most beneficial to plaintiff, profits on future RACER purchases must be deemed remote and not foreseeable. The evidence demonstrates the absence of a dispute as to a material issue of fact concerning such damages and defendant is entitled to summary judgment on this issue.

### Conclusion

For the reasons set forth above, defendant's motion for summary judgment is granted as it relates to Counts II, III and VI of the complaint. Summary judgment is denied with respect to Counts I, IV, V, VII, and VIII.

On or before June 13, 1991, the parties shall file a status report, jointly or separately, advising the court as to their intentions with respect to further proceedings in this action.

IT IS SO ORDERED.

---

**12.** Plaintiff characterizes its right with respect to Units # 4 and # 5 as giving Solar a right to first refusal. But the government had the *option* to purchase Units # 4 and # 5 from Solar. It could have refused to exercise that option and purchased the units instead from other contractors.