**SOLAR TURBINES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 53–88C.**

United States Claims Court.

Sept. 25, 1992.

Dan Burt, Washington, D.C., for plaintiff.

George M. Beasley, III and Shelley L. Tucker, with whom were Asst. Atty. Gen. Stuart M. Gerson, and David M. Cohen, Director, Washington, D.C., for defendant. Royanne C. Bailey and Millicent M. Gompertz, U.S. Naval Sea Systems Command, of counsel.

## OPINION

ANDEWELT, Judge.

In this government contract action, plaintiff, Solar Turbines, Inc. (Solar), seeks damages in excess of $10 million for an alleged breach of a cost-reimbursement contract it entered with the United States Department of the Navy (the Navy). The contract in issue involved the design, development, and fabrication of a Rankine Cycle Energy Recovery (RACER) system for possible use on Navy gas-turbine powered ships. As modified, the contract placed a $55 million limitation on government payments for the contract work, but provided that upon reaching that $55 million cap, plaintiff could secure termination of the contract and, hence, avoid expending its own funds to complete the contract work. A central allegation in this action is that by the time plaintiff reached the $55 million cap, the Navy had already determined not to use a RACER system on any Navy ship. Plaintiff contends that despite this determination, the Navy, in violation of its contractual obligations, induced plaintiff to continue performance of the contract and invest its own money above the $55 million cap instead of seeking termination.

In a May 14, 1991, opinion, this court granted defendant's motion for summary judgment on three counts of the complaint. *Solar Turbines, Inc. v. United States*, 23 Cl.Ct. 142 (1991). Subsequently, the court conducted a trial on the remaining six counts. The court has considered all of the evidence presented at trial and the parties' post-trial filings. For the reasons set forth below, plaintiff's complaint is dismissed and defendant is granted judgment on all remaining counts.

### I.

In the mid– to late–1970s, in response to increased fuel costs and concerns about the reliability of fuel sources, the Navy began considering methods of enhancing the fuel efficiency of its fleet.[1] One technical approach the Navy considered was the use of a RACER system in coordination with the LM–2500 marine gas turbine engine. A RACER system was originally conceived as a compact, easily maintained steam propulsion system. A RACER system could be fitted to the exhaust of the LM–2500 engine and the heat of the exhaust could be used to produce steam which in turn would drive supplemental steam turbines and deliver additional power to the ship's propellers. By producing additional power, a RACER system would enable a ship to travel further on a given quantity of fuel.

On September 30, 1981, the Navy awarded plaintiff, a wholly owned subsidiary of Caterpillar, Inc., a cost-plus-award fee contract for the preliminary design of a RACER system. On May 7, 1982, the contract was modified to provide for the full-scale engineering and development of a RACER system. As so modified, the contract called for plaintiff to fabricate, test, and deliver three RACER prototypes for an estimated cost of $34.2 million. All three prototypes were intended for the sole purpose of testing and none was intended to be placed in service in the Navy fleet. The first prototype was to undergo testing at

---

1. Although the Navy was primarily interested in achieving greater fuel efficiency, it also hoped to reduce en route refuelings and increase contingency response capability.

the Naval Ship Systems Engineering Station (NAVSSES), the Navy's land-based test site in Philadelphia; the second prototype was to be shock tested in a quarry to insure its survivability in combat; and the third prototype, which would contain modifications to correct any design flaws uncovered in the tests of the first two prototypes, was to undergo final testing at sea aboard a Navy ship.

## II.

At the same time the Navy was considering the possible use of RACER technology on its ships, the Navy was developing a new class of multipurpose guided missile destroyers known as the Arleigh Burke, or DDG–X, class. In 1981, the Armed Services Committee of the United States House of Representatives (HASC) recommended termination of the DDG–X program because it was concerned that the Navy, in designing the DDG–X, focused too much on cost and not enough on warfare capability. In conversations with Anthony R. Battista, a highly influential staff employee of the HASC, Navy officials indicated their intent to modify the design of the DDG–X to include a series of advanced technologies and features that would enhance the DDG–X's war fighting capability. One of the advanced technologies proposed was RACER.

The HASC ultimately approved continued funding for the DDG–X program, and by June 1981, space and weight for a RACER system were included in the preliminary design of the first, or lead, ship of the first flight of the DDG–X class, the DDG–51. However, apparently based on concerns about the timing of RACER development, the Navy initially did not anticipate installing a RACER system on the DDG–51 prior to commissioning. Navy officials reasoned that because the Navy had reserved space and weight for a RACER system in the design of the DDG–X, they could install the system during construction of later ships, beginning most likely with the first ship of the second flight of the DDG–X class, i.e., the DDG–58, and, if desired, could backfit previously commissioned ships to include RACER systems.

Battista disagreed with this approach and strongly urged the Navy to pursue RACER development in sufficient time to include a RACER system during construction of the first ship of the first flight. The Navy took Battista's representation very seriously. Navy officials believed that Battista was very powerful in the congressional appropriation process and could affect adversely other Navy programs. Therefore, the Navy initially reversed its position that a RACER system would not be installed on the DDG–51. In March 1982, Melvyn R. Paisley, Assistant Secretary of the Navy for Research, Engineering, and Systems, instructed his staff to redirect RACER development efforts toward the system being developed in sufficient time to meet the schedule for construction of the DDG–51. But in February 1983, based on concerns that RACER had not yet been thoroughly developed and tested, John F. Lehman, Jr., Secretary of the Navy, directed the Navy to continue RACER development but defer plans for its incorporation on the DDG–51, at least until after "the system has had time to mature and its technical feasibility, reliability and cost effectiveness have been thoroughly demonstrated." After this decision, the Navy removed space and weight for a RACER system from the design of the DDG–51.

Battista responded critically. In March 1983, Battista told Navy officials that although he would abide by any future decision of the Navy not to install a RACER system on the lead ship because of technical difficulties, he would not now support a program that provided no chance for installation on the lead ship. Thereafter, Battista was involved in the drafting of legislation in which Congress expressed the firm view that the Navy should develop RACER for installation on all ships in the DDG–X class, including the DDG–51.

On September 24, 1983, Congress authorized $24 million "for continued development of the [RACER] system to ensure compatibility of the RACER system with all ships of the DDG–51 class, including the

lead ship." Department of Defense Authorization Act of 1984, Pub.L. No. 98–94, 97 Stat. 614, 622, 623. On October 19, 1984, Congress authorized $45 million for essentially the same purpose[2] but went even further by "fencing" the entire DDG–X program, a program that the Navy viewed as "high priority." Department of Defense Authorization Act of 1985, Pub.L. No. 98–525, 98 Stat. 2492, 2508. The "fence" consisted of a prohibition on the Navy spending any of the monies authorized for the DDG–51 guided missile destroyer program "until the Secretary of the Navy certifies to the Committees on Armed Services and on Appropriations of the Senate and House of Representatives that the lead ship in that program is capable of being equipped with a [RACER] system without rearrangement of ship spaces and equipment or other major modification to the ship." *Id.* at 2501.

In a November 28, 1984, letter to the chairman of the HASC, Secretary Lehman responded to the certification requirement in the 1985 Authorization Act as follows:

RACER was excluded from the lead ship design because its development schedule is not compatible with delivery of the lead ship.... The retrofit of RACER to the lead ship will not require modification to the length or width of the ship nor will it involve relocation of existing watertight boundaries.

In a December 13, 1984, response, the chairman of the HASC challenged the adequacy of Secretary Lehman's certification. Thereafter, on December 21, 1984, Secretary Lehman proffered a new certification. The new certification stated, in pertinent part:

I certify that the lead ship, DDG–51, will be capable of being equipped with a [RACER] system....

The current solicitation for the DDG–51 ... does not include this provision. Following award of the shipbuilding contract, an Engineering Change Proposal (ECP) will be requested from the ship-

builder to change the design such that it meets the requirements of Defense Authorization Act, 1985.

In April 1985, the Navy awarded the DDG–X shipbuilding contract to Bath Iron Works (BIW). In September 1985, the Navy forwarded to BIW a request for an estimate of the cost of implementing an ECP to include space and weight for a RACER system on the DDG–51. BIW responded with a rough estimate that depending on timing, an ECP could cost up to $60 million and involve a 14–month delay in ship delivery. BIW delivered its final ECP on January 24, 1986.

### III.

During the course of performance of the contract, officials within the Navy became concerned, *inter alia*, about (1) the technical viability of the RACER technology on warships, (2) the general cost effectiveness of a RACER system, and (3) plaintiff's ability to produce a working RACER unit at a reasonable price. At that time, the instant contract was a cost-plus-award fee contract, and the Navy, in effect, bore the financial risk if the cost of completing the project exceeded estimates.

In response to its growing concerns, the Navy authorized an evaluation of the contract by an outside consultant. The resulting report indicated that as of February 1984, plaintiff was approximately four months behind schedule and slipping, and that plaintiff ultimately would need $87 million to complete the contract work, or 154% more than the $34.2 million initially estimated. Plaintiff itself reported a cost growth of $11.4 million, and on May 10, 1984, requested an additional $12.8 million in its formal "Estimate–to–Complete Proposal," in which Solar placed the total estimated contract cost at approximately $54.9 million. Concerned by the cost growth, Assistant Secretary Paisley directed his negotiating staff to seek a contract modification that would provide plaintiff with some

---

**2.** Section 203(a) of the 1985 Authorization Act provides, in pertinent part: "Of the amount authorized in section 201 for the Navy ... $45,-000,000 is available only for continued develop-

ment of the [RACER] system to ensure compatibility of the RACER system with all ships of the DDG–51 class, *including the lead ship.*" *Id.* at 2508 (emphasis added).

of the additional funding it requested but that also would cap the government's total liability under the contract at $52.3 million. At the time, in a general effort to control Navy costs, Assistant Secretary Paisley also favored using similar caps in certain other cost-plus-award fee research and development contracts.

The parties initially were unable to agree on a contract modification. While the Navy insisted on a cap on government expenditures, plaintiff was reluctant to accept the risks inherent in agreeing to develop a RACER system for a set price. This deadlock was broken during two meetings on December 5, 1984, which involved Assistant Secretary Paisley and John N. Hanson, president of Solar. During these meetings, Assistant Secretary Paisley told Hanson that the RACER program was critical to the Navy but that it had to be managed within a reasonable cost structure. Thereafter, the parties negotiated a Memorandum of Understanding (MOU) dated December 28, 1984.

On April 19, 1985, the pertinent parts of the MOU were made part of the contract through contract modification P00037. In clause H–20, entitled "Ceiling Amount," the P00037 modification provided that the total liability of the government for both costs and fee would not exceed $55 million. However, once the costs and fee exceeded $55 million, plaintiff had the option to request, and automatically receive, a termination of the contract for the convenience of the government.[3] The P00037 modification also granted the Navy an unpriced option to have plaintiff design and manufacture two RACER units in addition to the three prototypes provided for in the May 7, 1982, modification. The Navy could exercise this option at its own discretion and the Navy was not in any way obliged to purchase these additional units. Also, as with the MOU, the P00037 modification did not commit the Navy to complete development or testing of a RACER system or deploy RACER on any active ship, and, as with earlier modifications, nothing in the P00037 modification specified any relationship between RACER and the DDG–X program.

The P00037 modification also established certain testing deadlines. For example, developmental testing of the first prototype was to be completed by September 30, 1985. The testing had to last a target of 1000 hours and include a reliability and maintainability demonstration run of 100 hours. Plaintiff was then to deliver the first prototype to the Navy for additional Navy testing. Any defects uncovered during this testing of the first prototype or the shock testing of the second prototype had to be corrected and the corrections incorporated into the third prototype, which plaintiff had to deliver to the Navy by August 1, 1986, for at-sea testing aboard a Navy ship. Due to problems, the September 30, 1985, deadline for completion of testing of the first prototype later slipped to January 31, 1986.

## IV.

Responsibility for setting the requirements for naval surface ships rested with

---

3.  Clause H–20 provides, in pertinent part:
    H–20 Ceiling Amount
        (a) It is understood and agreed by the Parties that the total liability of the Government under this contract shall not exceed $55,000,-000. Notwithstanding the terms of the "Limitation of Cost" clause of the contract, the Contractor will bear 100% of all costs which, when added to previously incurred costs plus the fixed and base fee amounts set forth in Section B ... cause the total costs and fee to exceed $55,000,000, and, except as provided in paragraph (b) below, will fully perform all obligations under the contract irrespective of not being reimbursed for such costs.
        (b) If the Contractor's cost of meeting all requirements of the contract when added to the total fee amount exceeds $55,000,000, the Contractor shall have the option of continuing performance totally at its own expense, or, at any time, requesting the Government to terminate the contract for the convenience of the Government. The Government shall comply with any such request for termination. Nothing in this clause in any way restricts the Government's right to terminate this contract pursuant to the "Termination" clause of the contract. In the event of termination, whether initiated at the Contractor's request or otherwise, it is understood and agreed that the Government's total liability shall not exceed $55,000,000.

Vice Admiral Joseph Metcalf, III, Deputy Chief of Naval Operations for Surface Warfare. Admiral Metcalf initially was of the opinion that a steam-based system such as RACER should not be installed on a combat ship such as those ships of the DDG–X class. Admiral Metcalf visited NAVSSES to assess whether this intuitive opinion was correct, and, upon viewing the site, he confirmed this opinion. Admiral Metcalf was concerned that the RACER prototype was too large and too complex for ships the size of the DDG–X class ships. In addition, he was very concerned about a noise problem that had been detected during testing and about the proposed solution for that problem. Admiral Metcalf expressed these basic concerns to Solar personnel at NAVSSES. At trial, Admiral Metcalf explained that "noise is fatal on a combat ship" and that after his visit to NAVSSES, he had concluded that "they probably were not going to be able to solve ... the noise problem and therefore, [RACER] was completely inappropriate to a ... warship." However, Admiral Metcalf was of the opinion that RACER potentially could be useful on an auxiliary ship or another type of ship. He believed the size of the RACER system would be less of a concern on such other ships and the noise problem could be solved "in a technical sense" for these ships because, unlike combat ships which quickly shift speeds, other types of ships tend to steam at a steady speed.

During the summer of 1985, Admiral Metcalf met with Battista and explained his position that a RACER system should not be installed on DDG–X class ships. On September 9, 1985, upon Admiral Metcalf's request, Battista visited NAVSSES. However, Battista did not change his position that the Navy should install a RACER system on all DDG–X class ships, including the DDG–51.[4]

In the fall of 1985, as plaintiff approached the $55 million cap on government payments, Hanson sent Peter A. Carroll, Solar's vice president, to Washington, D.C., to conduct discussions with Navy personnel to evaluate the merits of Solar investing its own money in RACER development. At the time, plaintiff anticipated that a RACER system probably would not be installed on any ship in the first flight of the DDG–X class (the DDG–51 through the DDG–57), but would be installed, if at all, on later ships starting with the DDG–58.

The most important of Carroll's meetings while in Washington were with Admiral Metcalf and Assistant Secretary Paisley. However, before meeting with Admiral Metcalf and Assistant Secretary Paisley, Carroll had a series of meetings with lower-level Navy officials. Certain of these officials expressed significant concerns about the RACER program. These concerns involved the size and complexity of the first prototype, plaintiff's inability to satisfy the delivery schedule within the time period needed for installation on the DDG–51, and the appropriateness of the Navy adding a steam-based propulsion system such as RACER to Navy ships.[5] Dur-

---

4. Apparently during this same general time period, the Armed Services Committee of the United States Senate was placing inconsistent pressures on the Navy. The Senate Committee wanted the DDG–51 to have increased helicopter capabilities, including a hanger. But the physical configuration of the ship as it was being built could not accommodate both the helicopter facilities and a RACER system.

5. Admiral John F. Shaw, head of the Navy's AEGIS shipbuilding program, expressed concern about RACER's size and its development schedule and stated that in order not to affect adversely the construction of the DDG–51, Solar had to develop RACER on time. In response to Admiral Shaw's comment about size, Carroll responded that RACER could be made smaller

but that any downsizing would further delay its development.

Anthony R. DiTrapani, the Navy's Director of Ships Programs, was also concerned about RACER's size and weight and he bluntly told Carroll that he did not view the RACER system favorably because he believed he had been deceived about the system's complexity.

Captain Brian T. Perkinson, the Navy's Assistant Director of Shipbuilding, also expressed concern about Solar meeting its development schedule and the chance that a lag in RACER development could delay construction of the DDG–51.

Admiral James H. Webber, the Navy's Chief Engineer, told Carroll that, although he was interested in the RACER technology, he was concerned about reintroducing steam to Navy

ing the course of these meetings, Carroll was informed that BIW, the contractor for the construction of the DDG–X ships, had estimated that the modifications to the original DDG–X design necessary to provide space and weight for a RACER system would cost up to $60 million.

On October 24, 1985, in a meeting with Assistant Secretary Paisley, Carroll discussed the possibility of downsizing the RACER structure so as to overcome some of the objections that had been raised in his previous meetings with Navy personnel. But, since downsizing would take additional time, Assistant Secretary Paisley rejected this approach. He indicated that the design, development, and testing of any improvements potentially could be done later but that the Navy would continue with the testing of the present system. In addition, Assistant Secretary Paisley explained, in effect, that despite strong opposition within the Navy, Congress was insisting that a RACER system be installed on all DDG–X ships. Assistant Secretary Paisley said that if the RACER system was decoupled from the DDG–51, RACER would be "dead," and that Solar, therefore, needed to meet the existing RACER testing schedule. Within a few days after this meeting, and after conversations with Carroll, Hanson, Solar's president, approved Carroll's recommendation to fund the continued testing of the first RACER prototype.

Since congressional pressure on the Navy was coming through Battista, Assistant Secretary Paisley had suggested to Carroll during their October 24 meeting that Carroll meet directly with Battista. Carroll had such a meeting on October 31, 1985. Carroll indicated to Battista that he was concerned about the Navy's objections to the RACER system and discussed the possibility of downsizing RACER and possibly placing it on some class of ships other than the DDG–X. Battista treated Carroll

bruskly. Battista responded that Solar had no place in determining naval ship requirements and that Solar should concern itself only with its efforts to develop the RACER system. Battista further explained that the RACER procurement was part of a power struggle between Congress and the Navy and that a contractor, such as Solar, should not be part of the Navy's procurement process. Battista issued a warning to Carroll and used the analogy that when elephants fight (i.e., the Navy on one hand and Congress on the other), the grass (i.e., Solar) gets trampled.

After his meeting with Battista, Carroll requested a meeting with Admiral Metcalf and a second meeting with Assistant Secretary Paisley. Carroll met with Admiral Metcalf on November 1, 1985. Admiral Metcalf indicated to Carroll that he had no contracting authority to procure any RACER units for deployment on Navy ships, but that he did set the requirements for those ships. Carroll stated that he was going to make a further recommendation to Solar's president as to the advisability of investing corporate funds to continue the development of a RACER system, but that Carroll was concerned that the Navy did not want a RACER system on the DDG–X class ships. Admiral Metcalf confirmed that he did not want a RACER system on any Navy combat ship, including the DDG–X class. But Admiral Metcalf encouraged Solar to continue testing and explained that the RACER technology possibly could be used on an auxiliary ship or some other Navy vessel. Admiral Metcalf explained that since such ships tend to move at a level speed, "the very, very key issue of noise could undoubtedly be solved in a technical sense." Carroll indicated that Solar never wanted the RACER system tied to a specific ship or to tell the Navy on which ship the system should go. Carroll stated that he hoped that the Navy would not

ships and the corresponding need to train new steam technicians.

Admiral Raymond G. Zeller, Director of the Surface Warfare Division in the Office of the Chief of Naval Operations, met with Carroll to discuss Carroll's downsizing suggestion. During this meeting, Admiral David M. Altwegg, Assis-

tant Deputy Chief of Naval Operations, Surface Warfare, joined in and offered Carroll a most pessimistic view of RACER's prospects. Admiral Altwegg told Carroll that the Navy would test RACER but would never use it because the Navy should not, and would not, return steam to Navy ships.

"slam the door shut" on the RACER technology "over an application to one ship."

As to the viability of the RACER technology, Carroll acknowledged that problems had arisen during the testing of the RACER prototypes but concluded that all of the problems were solvable. Carroll expressed concern, however, about whether the problems could be solved within the existing contract schedule. Carroll feared that Solar's reputation may become stained because, under the current cost and time schedules, the RACER program would "probably fall flat on its face." When Admiral Metcalf asked what Solar would need to complete RACER development and testing, Carroll responded that it would need $5 million, a two- to three-month delay of the program, and decoupling of RACER from the construction of the DDG–51.

On November 7, 1985, Carroll again met with Assistant Secretary Paisley. Carroll indicated that Solar had reached the $55 million cap and that before spending any of its own money on RACER development, Solar wanted to confirm that the Navy would use a RACER system on the DDG–51 or other ships of the DDG–X class. When Carroll stated that Admiral Altwegg and other Navy officials were against installing a RACER system on any Navy ship, Assistant Secretary Paisley said that it had always been his position to continue RACER development and install a RACER system on ships of the DDG–X class, and the only issue was whether it would be on the first ship, the DDG–51, or on some later ship of the DDG–X class. Assistant Secretary Paisley told Carroll that "[i]f you really believe that [RACER] is a good system, then once you get it on a ship ... and we test it and if it works that well, you won't be able to build them fast enough, that the Navy will wind up buying a lot of systems." Assistant Secretary Paisley indicated that if he were Carroll, he would recommend that Solar make the investment to complete testing of the existing system and pursue the improved smaller system Carroll had proposed. Assistant Secretary Paisley noted that contractors normally incur costs when they first enter government business, but once in, contractors have found government business profitable. As to the reluctance of some Navy personnel with respect to RACER, Assistant Secretary Paisley told Carroll that he had seen a number of programs that Navy personnel did not seem to want, but that once the product went into the fleet and was successful, the "Navy loved it."

Assistant Secretary Paisley spoke with Battista that same day, and then on November 12, 1985, met with Admiral Metcalf and others. During his meeting with Admiral Metcalf, Assistant Secretary Paisley recommended that the best approach with respect to Battista would be to find a different ship on which to place a RACER system (he proposed the AOE–6) and then inform Congress that if a RACER system "proves out we will put it in a 'ship.'" Admiral Metcalf thereafter requested consideration of the feasibility of placing a RACER system on the AOE–6 which, at that time, was in the design phase.

Over approximately the next month, while Admiral Metcalf investigated two possible alternate ships for RACER, the AOE–6 and the AE–36 auxiliary class ships, Assistant Secretary Paisley and Everett Pyatt, Assistant Secretary for Shipbuilding and Logistics, were lobbying Congress for relief from the RACER requirement on the DDG–51. In a December 8, 1985, memorandum, Assistant Secretary Pyatt told Admiral Metcalf that he thought he might have succeeded in his lobbying effort. On December 19, 1985, Assistant Secretary Pyatt's impressions were proven correct. In a Conference Report for Continuing Appropriations for Fiscal Year 1986, H.R.Conf.Rep. No. 450, 99th Cong., 1st Sess., 205 (1985) (hereinafter Conference Report), Congress removed the pressure on the Navy to install a RACER system on the DDG–51, but continued to encourage RACER "for future Navy ship construction programs." The report stated:

> In its review of prior year funds, the conferees learned that significant cost growth could be incurred on the DDG–51 lead ship due to propulsion system price increases. As a result of testing delays

on the [RACER] system, the ship construction schedule could slip more than a year and cost increases may be incurred in excess of 15 percent of basic construction cost. In view of the cost and schedule impact, Navy should discontinue plans for RACER installation on the lead ship. Concurrent with the ongoing RACER test program, the Navy should continue development of RACER installation plans for future Navy ship construction programs.

## V.

After Congress lifted its pressure on the Navy to install RACER on the DDG–51, plaintiff sought to renegotiate the terms of the instant contract. During the first week of January 1986, Carroll met with Admiral Shaw, head of the Navy's AEGIS shipbuilding program, and delivered a January 3, 1986, letter in which Solar proposed that the parties negotiate "a readjusted and improved RACER Development Testing Program." Solar proposed to improve the RACER development and testing program by reducing the size, weight, and complexity of the RACER system. Plaintiff requested $14.4 million above the $55 million cap and asked for a delay in testing and an approval to lower its costs by conducting certain tests on land that had originally been scheduled for at sea. After his meeting with Admiral Shaw, Carroll was sufficiently concerned about RACER's prospects that he slowed down testing at NAVSSES. But even though Carroll believed that the Navy did not want the RACER system, he decided to complete the 100–hour reliability and maintainability test anyway. Carroll explained:

> If we were wrong, if the Navy wanted the system, we needed to complete the test. We had committed to do that. So we said we'd finish the 100–hour test. We'll have that data point and we'll drive to get the answer.

The Navy responded to plaintiff's proposal in a January 31, 1986, letter from Admiral William H. Rowden, Commander of the Naval Sea Systems Command (the Navy agency responsible for the design, development, and engineering of Navy ships and submarines). Admiral Rowden took the position that the Navy might assume some additional costs for the testing required under the contract, but that the contract price would remain capped at $55 million. Solar officials found Admiral Rowden's letter encouraging in that, by agreeing possibly to shift certain costs to the Navy, the letter, in effect, indicated the Navy's willingness to break the contract's $55 million cap on government payments. But Admiral Rowden's letter fell short of Solar's desire to have the Navy assume full financial responsibility for development of a RACER system. In a February 6, 1986, letter, Carroll offered the Navy three choices, two of which involved the Navy paying for additional testing and the third of which involved the parties negotiating a mutual termination of the contract pursuant to which the Navy would pay Solar $11 million above the contract cap.

In a February 19, 1986, memorandum to Admiral Rowden, Admiral Metcalf noted that "since RACER is still in the developmental stage, a final decision to include RACER [on the AE–36] cannot be made now; however, proceed to include RACER as space and weight in the AE–36 design." On February 20 1986, Admiral Metcalf decided to terminate the RACER program as it related to placing a RACER system on DDG–X class ships.[6] In a February 25, 1986, response to plaintiff's offer of three options, Admiral Rowden indicated that the $55 million cap was negotiated in good faith and the Navy "will reject any contention that it should now pay more." In return, Admiral Rowden offered plaintiff three very different options than those Solar had proposed. Admiral Rowden requested that plaintiff (1) request termination of the contract, (2) live up to the contract and deliver the three RACER pro-

---

**6.** Admiral Metcalf testified that he terminated the entire RACER program on February 20, 1986, but his memory generally as to specific dates and specific meetings was not precise and the contemporaneous documents support the finding that on February 20, 1986, Admiral Metcalf decided only to terminate the Navy's plans for RACER as they related to the DDG–X class.

totypes provided for in the contract, or (3) notify the Navy that it would refuse to live up to the contract.

Thereafter, the parties entered into negotiations in an attempt to secure termination of the contract on mutually agreeable terms. Certain Navy officials, including Admiral Metcalf, believed that it was appropriate that the Navy enter into an agreement pursuant to which the Navy agreed to pay plaintiff's reasonable testing costs above the $55 million cap. While the parties were successful in producing a tentative agreement, labeled a "Proposed Mutual Termination Modification," ultimately negotiations broke down and the parties never entered a binding agreement obliging the Navy to make any payments in excess of the $55 million cap. *See Solar*, 23 Cl.Ct. at 149–53. On May 8, 1986, David L. Boyer, the contracting officer, unilaterally terminated the contract for the convenience of the government. Plaintiff submitted a termination settlement proposal but the contracting officer rejected it. On January 22, 1988, Solar filed the instant suit.

## VI.

■ As noted above, six counts remain in this action. In each count, plaintiff alleges that the Navy took actions inconsistent with its obligations under the contract. Plaintiff seeks as damages, *inter alia*, contract costs it incurred above $55 million. Count I alleges a failure to disclose superior knowledge, Count IV alleges misrepresentation, Count V alleges breach of warranty, Count VII rests on equitable estoppel, Count VIII alleges a breach of an implied covenant of good faith, and Count IX alleges improper termination of the contract for the convenience of the government.

Defendant contends that this court need not reach the merits of these six remaining counts because each count should be dismissed on jurisdictional grounds. The Contract Disputes Act, 41 U.S.C. § 601, *et seq.*, requires that prior to institution of a suit on a contract claim in the United States Claims Court, the claim previously must have been submitted in writing to the contracting officer.[7] Here, plaintiff did submit a claim to the contracting officer on November 14, 1986, prior to instituting the instant action. *See Solar Turbines, Inc. v. United States*, 16 Cl.Ct. 304, 310 (1989). Defendant contends, however, that the facts and theories upon which plaintiff now relies to support the remaining counts of the complaint are so different from those facts and theories submitted to the contracting officer on November 14, 1986, that the remaining counts should be considered never to have been submitted to the contracting officer and, therefore, not properly before this court.

The CDA does not define the requirements for a proper "claim." In *Contract Cleaning Maintenance, Inc. v. United States*, 811 F.2d 586, 593 (Fed.Cir.1987), the Court of Appeals for the Federal Circuit described the requirements for a claim as follows:

> We know of no requirement in the [CDA] that a 'claim' must be submitted in any particular form or use any particular wording. All that is required is that the contractor submit in writing a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim.[8]

Upon review, the court concludes that the November 14, 1986, claim provided adequate notice to support the six remaining counts of the complaint. The instant counts essentially are variations and ampli-

---

**7.** 41 U.S.C. § 605 provides, in pertinent part: "All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision." If the claim is denied, the contractor has the option of bringing a direct action on the claim in the United States Claims Court under 41 U.S.C. § 609.

**8.** The instant contract contained a definition of a "claim" in its "Contract Disputes Clause," as follows:

(c)(1) As used herein, "claim" means a written demand or assertion by one of the parties, seeking as a matter of right, the payment of money, adjustment or interpretation of contract terms, or other relief, arising under or relating to this contract.

fications of the November 14, 1986, claim, updated so as to include facts that were unknown to plaintiff at the time of the claim and were uncovered during the course of discovery in this action.

In the November 14, 1986, claim, plaintiff sought, *inter alia,* to recover all of the costs it had incurred in performing the contract above the $55 million cap on government liability. Plaintiff seeks the same recovery here. Moreover, the theoretical basis for recovery articulated in the November 14, 1986, claim is essentially the same basis as plaintiff sets forth to support the instant counts. The central theme in the 1986 claim was that Solar spent its own money after reaching the cap because it believed, based on actions by the Navy, that the Navy would purchase the RACER system for use on Navy ships. The claim stated:

> What Solar's executives did not know, and could not have known, was that the Navy's representations concerning its production plans were false when made. Specifically, the Navy had determined prior to December 1984 that the RACER systems could never be procured and that the options which it proposed would never be exercised.

Near the end of the claim letter, Solar further explained:

> *Had the Navy advised Solar at any time before Solar's costs, fee and termination costs totaled $55.0M that it had no plans for production. Solar could have ended the program and received full compensation under the contract!* Therefore, every nickel which Solar "invested" in the program beyond the cap, was spent in continuing reliance on the Navy's false promise of production. In fact, even before reaching the cap Solar was investing previously earned profit (fee) dollars toward costs incurred once above $53 M.

(Emphasis in original.)

As will become apparent from the detailed discussion below, the factual allegations presently underlying the remaining individual counts to a large extent are based on this same general theme. Plaintiff contends, in effect, that the Navy induced Solar to spend its own money on testing the RACER system even though the Navy had no intention of ever purchasing RACER units for installation on Navy ships.

In its November 14, 1986, claim and accompanying papers, Solar alleged a failure to disclose superior knowledge (corresponding to Count I), misrepresentation (corresponding to Count IV), fraud and overreaching (equivalent to bad faith and, thus, corresponding to Count VIII), and improper termination of the contract for convenience (corresponding to Count IX). While not specifically alleging a breach of warranty (Count V) or relying on equitable estoppel (Count VII), the November 14, 1986, claim contains allegations that arguably can be interpreted to encompass such contentions.

Clearly, the evidence upon which plaintiff now relies to support the remaining counts has expanded well beyond the evidence listed in the November 14, 1986, claim. In the course of very extensive documentary and deposition discovery, plaintiff has uncovered evidence to support its claim which previously was in the exclusive possession of Navy officials and unavailable to plaintiff. But, while the factual contentions supporting plaintiff's allegations that defendant withheld superior knowledge, made misrepresentations, etc., have evolved even since the filing of the instant complaint, the basic theme of plaintiff's concern has remained the same as when the November 14, 1986, claim was filed. Plaintiff, in effect, alleges that the Navy, through actions and inactions inconsistent with its contractual requirements, induced plaintiff to invest in the RACER system when the Navy had no intention of using the system. The Navy had ample notice of the essential basis for plaintiff's claim in 1986 and the 1986 claim is deemed an adequate basis to support a Claims Court action on the instant counts.[9]

---

9. *Reliance Insurance Co. v. United States,* 931 F.2d 863 (Fed.Cir.1991), upon which defendant relies, does not suggest a different result. In *Reliance,* the contractor presented a claim to the

## VII.

Since, as explained above, each of the remaining counts constitutes to some extent a variation of a common theme, before defining and applying the legal requirements for each count, it is appropriate for the court to explain the common theme in some detail and then to comment on the evidence plaintiff has submitted to support it.

The essence of plaintiff's argument is as follows. In the fall of 1985, Navy officials perceived that the Navy had a problem. While Battista was pressuring the Navy to install a RACER system on all DDG–X class ships, including the DDG–51, Navy officials did not believe in the RACER technology, did not want a RACER system installed on any Navy ship, and, therefore, wanted to end RACER development. But the Navy was concerned that Battista would become angry and cause problems for future Navy procurement efforts if, upon reaching the $55 million cap, Solar exercised its option and secured termination of the contract. Faced with this dilemma, plaintiff alleges Navy officials constructed a multifaceted nefarious plan pursuant to which Navy officials would induce Solar to invest Solar's own money in RACER development and testing, but at the same time the Navy would assure the end of the RACER program through a four-prong strategy. The alleged four prongs involved (1) urging Solar to continue RACER testing at NAVSSES in the hope that Solar would fail to make the system work, (2) encouraging Solar to expend its own funds on RACER develop-

ment after it reached the contract cap in the hope that Solar's parent company, Caterpillar, Inc., would pressure Solar to stop the development of the RACER system, (3) lobbying Congress to reverse the link between the RACER system and the DDG–X class ships, and (4) if all else fails to end RACER development, spending the money necessary to implement an ECP and redesign the DDG–51 to make space and weight available for RACER installation, but then proceeding to "kill" RACER's use at a later time. Plaintiff contends the principle wrongdoers in this alleged plot are Admiral Metcalf and Assistant Secretary Paisley, and the principle meetings at which the Navy improperly induced plaintiff to continue testing are the October 24 and November 7, 1985, meetings between Carroll and Assistant Secretary Paisley and the November 1, 1985, meeting between Carroll and Admiral Metcalf.

While there are some aspects of plaintiff's proof that give this court pause, ultimately, upon review of the extensive evidence submitted at trial, the court concludes that plaintiff has not proved that the Navy had determined not to use a RACER system on any Navy ship or that the Navy had adopted the multifaceted strategy plaintiff proposes to "kill" the RACER program.

Plaintiff's evidence concerning the Navy's alleged improper conduct forcuses primarily on the period after Battista visited NAVSSES on September 9, 1985.[10] Upon hearing that Battista had not changed his mind and was still insisting that a RACER system be installed on the

---

contracting officer seeking an equitable adjustment in the contract, but when the contractor brought suit in the Claims Court, it changed its approach and alleged a breach of contract. Citing *Contract Cleaning Maintenance*, 811 F.2d at 596, the court in *Reliance* held that a breach of contract action would not lie in the Claims Court because the contractor had never alleged a breach of contract to the contracting officer. 931 F.2d at 866. Here, for the reasons set forth above, while additional facts have been presented, the essential basis of the Claims Court action is the same as the claim presented to the contracting officer in 1986. Plaintiff has consistently alleged that the Navy breached its contractual obligations.

10. In its November 14, 1986, claim, plaintiff alleged that the Navy had determined not to use a RACER system on any Navy ship before it entered the P00037 modification on April 19, 1985. But, at trial, most of the pertinent evidence focused on Navy actions after September 9, 1985. Rather than supporting the allegations in the 1986 claim, the evidence submitted at trial indicates that at the time the P00037 modification occurred, the Navy anticipated that if the RACER technology worked, the Navy would be obliged to incorporate a RACER system no later than on the second flight of the DDG–X series.

**1262**

DDG–51, Admiral Metcalf requested that his subordinates develop an appropriate outline as to how to proceed. Over the following weeks, with Admiral Metcalf's input, those subordinates developed such a plan and embodied that plan in a document entitled "RACER STRATEGY" (hereinafter the RACER Strategy). This document is a centerpiece of plaintiff's argument that the Navy acted in bad faith and in violation of its obligations under the contract. But, upon close review, the RACER Strategy does not indicate, as plaintiff alleges, that the Navy had made a final decision not to employ a RACER system on any DDG–X ship, much less any ship in the Navy fleet, or that the Navy had embarked upon a four-prong approach to "kill" the RACER program.

VIII.

The RACER Strategy was prepared in response to Admiral Metcalf's September 17, 1985, memorandum requesting a merits-oriented discussion of RACER which took "the high ground."[11] The RACER Strategy had three principle sections. The first section, entitled "Background," discussed the status of RACER testing. It noted that factory testing of the first prototype had been delayed from September 30, 1985, to January 31, 1986, that several major technical problems remained unsolved ("excessive airborne noise, hot steam valve control and turbine case bowing"), and that if factory testing was not completed by January 31, 1986, either the results of that testing would not be completed in time to be incorporated into the third prototype, or the at-sea testing sched-

ule of the third prototype would have to be delayed. The second section, entitled "Discussion," contained a "MILITARY WORTH ASSESSMENT," which included a list of pros and cons of the RACER system from a military perspective and a "COST ASSESSMENT" which described the costs and anticipated savings that would result from installing and utilizing a RACER system.

The third section, entitled "Recommendations," is the principle focus of plaintiff's argument. This section clearly recommended that the Navy take action in an effort to avoid implementing an ECP and immediately redesigning the DDG–51 to make it RACER compatible. Despite plaintiff's contentions, however, the recommendations contained in this section do not indicate that the Navy had made any final determination not to install a RACER system on any of the DDG–X class ships, much less that it would not install a RACER system on any other Navy ship. Indeed, the recommendations contained therein could not have reasonably reflected such a final decision because, as Battista had been demonstrating for years, the Navy would not be in a position to make such a final determination. Congress controlled the Navy's "purse strings" and had required Secretary Lehman to certify that the Navy would include space and weight for a RACER system on the lead ship. Ultimately, the Navy would have to adhere to Congress' directions with respect to RACER if the Navy wanted DDG–X class ships in its fleet.

The first recommendation made in the RACER Strategy was that the Navy con-

**11.** Admiral Metcalf's request stated, as follows:
Subject: RACER
I JUST READ WAYNE HUMPHREYS EXCELLENT TRIP REPORT ON TONY BATTISTA'S VISIT TO PHILLY AND NAVSSES.
WE CLEARLY HAVE A CHALLENGE. TONY [BATTISTA] APPEARS TO MADE [SIC] UP HIS MIND IN A "DON'T BOTHER ME WITH THE FACTS MODE."
WE NEED A STRATEGY ON HOW TO PROCEED. I WANT CLOSE REVIEW WHICH WILL ASSESS THE PROS AND CONNS [SIC] OF THIS SYSTEM. I WANT TO LOOK AT IT IN FROM TWO PERSPECTIVES:
MILITARY WORTH, I.E., WAR FIGHTING

COSTS: CONSTRUCTION, OPERATING AND LIFE CYCLE
PART OF MY CONCERN FOR THIS SYSTEM IS THE MAINTENANCE AND PERSONNEL BURDEN THAT RACER COULD PUT ON BOTH THE SHIP AND THE SYSTEM. IF THIS CAN BE EXPLICITLY QUANTIFIED, FINE: OTHERWISE WE MUST TRY TO DESCRIBE IN QUANTIFIABLE TERMS.
THE BOTTOM LINE IS POSITION ON THIS ISSUE THAT IS BASED ON "FACTS" AND IS DEVOID AS POSSIBLE OF EMOTION AND HYPERBOYLE [SIC]. LET'S TAKE THE HIGH GROUND.

tinue to proceed with the RACER test plan according to the schedule then in effect and that "no change be made to the program until SOLAR demonstrates a satisfactory system." Although plaintiff argues that this recommendation indicates the Navy's desire for Solar's RACER testing to fail, instead, the recommendation seems to be a reasonable and responsible approach to the technological problems that had arisen during testing, the delays that had previously occurred, and Battista's insistence that space and weight for a RACER system be included on the lead ship. There is no indication in this recommendation, or in the RACER Strategy as a whole, that the Navy necessarily wanted RACER testing to fail. Indeed, the Navy had invested $55 million into development of the system and, if RACER was technologically sound, it potentially could be used on other ships, even if it was not used on ships in the DDG–X class.

The second recommendation was as follows.

Encourage SOLAR to talk with other people in Washington but do not make any changes to the current contract or create any additional contracts. SOLAR is working on their own funds and corporate may soon put pressure on them to stop the development of a system the Navy does not desire to put on a ship.

It is not apparent to which "other people in Washington" the Navy referred or why Solar would be encouraged to talk to them. With respect to the second sentence, the reference to "corporate" seems to denote a recognition that plaintiff's parent company, Caterpillar, Inc., potentially could stop the RACER program by forcing Solar to request termination. While plaintiff suggests this recommendation reveals a plan to encourage Solar in the hope that Caterpillar would respond in this way, there is no statement to the effect that the Navy should take actions that it otherwise would not take, solely in an effort to secure Caterpillar's intervention. Moreover, there seems to be an inherent contradiction between plaintiff's contention that the Navy did not want Solar to request termination of the contract once it reached the $55

million cap out of fear of Battista's reaction, and plaintiff's contention that the Navy wanted Caterpillar to force Solar to seek such a termination. It is not apparent to the court why Battista, or any member of Congress, would be expected to have a different reaction depending on whether Solar or its parent company forced termination. In either case, the result would appear to be the same.

Plaintiff focuses on the phrase "a system the Navy does not desire to put on a ship" in the second sentence of this recommendation and argues that this shows that the Navy had already decided against the use of a RACER system on any ship, not just the DDG–51. But the related evidence, some of which is described above, indicates that neither Admiral Metcalf nor "the Navy" had come to the conclusion that a RACER system should not be used on *any* ship. At trial, Admiral Metcalf testified to the effect that during this period he believed that RACER was a potentially viable technology that could be used on certain Navy ships, but not on combat ships. Internal contemporaneous Navy memoranda tend to confirm that Admiral Metcalf had such a belief. Moreover, the second sentence of this recommendation does not suggest misleading Solar or Caterpillar as to the Navy's desires with respect to the use of a RACER system on the DDG–51 or any other ship. To the contrary, it seems to involve a prediction as to how Caterpillar may react to information it already possessed with respect to Navy officials' concerns about RACER (*i.e.*, the sentence seems to anticipate that Caterpillar may take action based on its understanding that some Navy officials were against RACER).

The third recommendation was as follows:

ECP sent to BIW for pricing September 1985, to be priced out by January 1986. Initial estimates by BIW are a cost of $60 million and a delay in DDG–51 delivery of 14 months; given a 1 May 1986 turn on. A 1 November turn on of BIW will cost about $20 million and delay lead ship about 3 months. I propose two alternatives: 1) Send a letter to Congress

to seek relief for DDG–51 RACER redesign; base this on the fact that the RACER system testing now has three major problems and system will not be demonstrated at the earliest until 1 February 1986; additionally the cost ($60 million) and delay (14 months) to the lead ship are excessive. Use SOLAR assistance. Continue to test RACER and commit to incorporating design mod[ification]s into DDG–51 first or second flight baseline should system test satisfactorily. 2) Turn BIW on now to redesign DDG–51 for RACER. Accept the increased cost and schedule delay to the lead ship. Then proceed to kill the RACER program on technical, cost and lack of warfighting enhancement issues. Of these two alternatives I recommend # 1.

The first alternative, the one recommended, involved the Navy working with Solar to relieve congressional pressure for the immediate redesign of the DDG–51. This recommendation specifically left open the possibility that the DDG–X class could be redesigned to include a RACER system at a future time if RACER tested out satisfactorily. ("Continue to test RACER and commit to incorporating design mod[ification]s into DDG–51 first or second flight baseline should system test satisfactorily.") Significantly, this alternative involved the Navy working in coordination with Solar and does not suggest that the Navy mislead Solar or act in bad faith.

As to the second alternative, to the extent that this alternative proposed the Navy not confronting Congress immediately with existing information as to problems with RACER but rather spending additional money on redesigning DDG–X ships for RACER and then seeking the elimination of RACER at a later time based on the same information, this recommendation certainly would seem offensive in its disregard of United States taxpayers. However, this alternative was not the one recommended and was characterized as an "off the wall" suggestion by the principle drafter of the memorandum, Captain Wayne Humphreys. Moreover, this alternative would appear to be predicated on the development of some additional new information in the future (through test results or otherwise) to confirm Admiral Metcalf's personal conclusion that a RACER system was not appropriate for use on the DDG–X class ships. As explained above, Congress controlled the Navy's shipbuilding authorizations and the funding of an ECP would have required an additional expenditure of taxpayers' money. Absent new and additional information indicating that a RACER system was inappropriate for the DDG–X class ships on technological, cost, or war fighting grounds, it is not clear that the Navy could have predicted any greater success in "killing" the RACER program after, rather than before, implementation of an ECP. Indeed, Battista and Congress would be expected to be even more inclined to insist on RACER's inclusion once the DDG–X class had been redesigned to provide space and weight for RACER.[12]

Thus, rather than supporting plaintiff's view that the Navy had decided not to use RACER on any ship and to embark on a plan to mislead Solar and "kill" RACER at any cost, the RACER Strategy seems to represent a much more benign effort. In the RACER Strategy, Admiral Metcalf did not want to proceed with the immediate redesign of the DDG–X class. Instead, he wanted to use Solar's assistance to secure a delay in implementing an ECP. Pursuant to the RACER Strategy, Admiral Metcalf was, however, willing to commit to future redesign of the DDG–X series if, as he did not then expect, RACER tested out satisfactorily.

## IX.

Turning to Carroll's respective meetings with Admiral Metcalf and Assistant Secre-

---

**12.** Plaintiff concentrates on Admiral Metcalf's testimony that he was prepared to take this second alternative if necessary. But Admiral Metcalf also testified that he would always comply with the law and that if Congress mandated implementing an ECP and employing RACER, he would do so. Thus, in order for Admiral Metcalf to implement the second alternative, the Navy, in effect, would have to convince Congress in the future not to insist on RACER being used on the DDG–X class.

tary Paisley, plaintiff alleges that in their respective meetings, Admiral Metcalf and Assistant Secretary Paisley acted pursuant to the alleged multifaceted nefarious strategy to encourage Solar to continue testing while the Navy went about "killing" RACER. As described above, the first of these meetings occurred between Carroll and Assistant Secretary Paisley on October 24, 1985. Plaintiff alleges that by that time, the Navy had already decided not to provide space and weight for a RACER system on the DDG–51 but that Assistant Secretary Paisley nevertheless, through dire predictions of RACER's prospects if Solar did not meet the testing schedule, compelled plaintiff into a "forced march" to meet the contract schedule. But the evidence does not indicate that Assistant Secretary Paisley previously had decided not to provide space and weight for a RACER system and not employ RACER on the DDG–X class, or that Assistant Secretary Paisley either wanted RACER testing to fail, or wanted plaintiff to request termination of the contract.

Rather, the evidence suggests that Assistant Secretary Paisley was honest and forthright at that meeting. As explained above, at the meeting, Assistant Secretary Paisley did not hide the fact that there was strong opposition within the Navy to RACER's use on the DDG–X class ships—indeed, he stressed that point. Moreover, Assistant Secretary Paisley was very direct concerning Battista's significance and encouraged Carroll to meet with Battista directly. As to an alleged "forced march" of testing, Assistant Secretary Paisley insisted merely that Solar meet the testing schedule provided in the contract. Rather than being indicative of any "strategy," this insistence that Solar meet the contract schedule for RACER seems a prudent response to Battista's insistence that RACER be included on the DDG–51. Any delay in RACER development could possibly result in corresponding delays in the construction of the DDG–51. Moreover, this October 24, 1985, meeting occurred approximately one week before the RACER Strategy was dated. Plaintiff has not demonstrated that at the time of the October 24 meeting,

Assistant Secretary Paisley was aware of Admiral Metcalf's recommendations as eventually set forth in the RACER Strategy, much less that Assistant Secretary Paisley was acting pursuant to those recommendations.

Turning next to Carroll's meeting with Admiral Metcalf on November 1, 1985, plaintiff alleges that Admiral Metcalf, with deceptive optimism, encouraged Solar to continue the testing at its own expense. But, as described above, Admiral Metcalf was very direct and did not "sugar-coat" his position that RACER should not be placed on any of the DDG–X ships or on any other combat ship. Indeed, Admiral Metcalf's position in this regard was the same both before and after development of the RACER Strategy. Admiral Metcalf had expressed similar reservations about RACER during Assistant Secretary Paisley's December 5, 1984, meeting with Hanson, and in statements to Solar employees when Admiral Metcalf visited NAVSSES.

Although Admiral Metcalf did encourage Solar to continue RACER testing, his exclusive focus was RACER's possible use on Navy ships other than the DDG–X class. While part of the reason Admiral Metcalf wanted to continue testing was because of concern about Battista's reaction if Solar sought cancellation of the contract, Admiral Metcalf also encouraged continued testing because he wanted to secure a return on the Navy's $55 million investment; he wanted to determine whether RACER was a viable technology that might be installed on Navy vessels. As explained above, Admiral Metcalf believed that RACER's excessive noise could not be addressed sufficiently to make RACER viable for combat ships, but that the problem possibly could be resolved so as to make RACER viable for non-combat Navy ships, including auxiliary ships.

Carroll's second meeting with Assistant Secretary Paisley occurred six days after Carroll's meeting with Admiral Metcalf, on November 7, 1985. Plaintiff accuses Assistant Secretary Paisley, *inter alia,* of bad faith representations of the Navy's intentions with respect to RACER and the

DDG–X class. Unfortunately, Assistant Secretary Paisley did not testify at trial so this court must assess these actions based on contemporaneous documents and the testimony of others.[13] While Assistant Secretary Paisley's statements, unexplained by him, are in some ways the most troubling part of this case, the court ultimately concludes that plaintiff has not proved that Assistant Secretary Paisley acted in bad faith, misrepresented any facts, or otherwise acted in a manner inconsistent with the Navy's obligations under the contract.

Admiral Metcalf testified that he showed Assistant Secretary Paisley the RACER Strategy prior to the November 7, 1985, meeting and that Admiral Metcalf believed that Assistant Secretary Paisley would go along with the recommendations contained therein and encourage Solar to continue RACER testing. But, as interpreted above, the RACER Strategy was designed to seek relief from Congress' requirement that the Navy immediately redesign the DDG–51. The RACER Strategy recommended to "[u]se Solar assistance" and "[c]ontinue to test RACER and commit to incorporating design mod[ification]s into DDG–51 first or second flight baseline should system test satisfactorily."

Moreover, just as Admiral Metcalf's statements to Solar had been consistent both before and after completion of the RACER Strategy, so too had Assistant Secretary Paisley's statements to Solar been consistent both before and during the November 7, 1985, meeting. Assistant Secretary Paisley, unlike Admiral Metcalf, was not a career Navy officer and apparently lacked at-sea experience and any intuitive opinion as to what technology would work on board Navy vessels. Instead, Assistant Secretary Paisley consistently took the rather pragmatic and straightforward position that he believed the Navy would purchase RACER for the DDG–X class if Solar proved that the RACER system worked, *i.e.,* if Solar proved that RACER was a viable and beneficial system. During his December 5, 1984, meeting with Hanson, long before the completion of the RACER Strategy, Assistant Secretary Paisley expressed this same position when he told Hanson that if the RACER development program was successful, the RACER system would be deployed in the Navy fleet. Assistant Secretary Paisley's statements during the November 7, 1985, meeting with Carroll, detailed above, reasonably could be interpreted to say no more.[14]

**13.** Plaintiff noticed the deposition of Assistant Secretary Paisley but Assistant Secretary Paisley refused to testify and claimed his fifth amendment rights against self incrimination. Assistant Secretary Paisley was the subject of a criminal investigation and on June 14, 1991, a criminal information was filed against him charging, *inter alia,* conspiracy to defraud the government. The criminal information alleged, in part, that Assistant Secretary Paisley had accepted bribes in exchange for sensitive Navy information that could provide contractors with an unfair advantage in competing for certain Navy procurement contracts.

Prior to trial, Assistant Secretary Paisley pled guilty and thereafter plaintiff requested that the government grant Assistant Secretary Paisley immunity for trial testimony in this action. But the government declined and neither party called Assistant Secretary Paisley as a witness at trial.

The crimes to which Assistant Secretary Paisley pled guilty are extremely serious and involve a fundamental breach of the public trust. However, the court will not presume from that guilty plea that Assistant Secretary Paisley engaged in any improper actions here. Assistant Secretary Paisley's alleged actions herein are very differ-

ent than those actions that gave rise to the criminal information filed against him. There has been no suggestion that Assistant Secretary Paisley had any personal financial interest in the outcome of the instant contract. Similarly, in assessing whether Assistant Secretary Paisley acted in bad faith, the court will not give significant weight either to Assistant Secretary Paisley's decision to assert his fifth amendment rights or to the government's decision not to extend Assistant Secretary Paisley limited immunity for trial testimony. These decisions certainly could have been based on reasons other than that Assistant Secretary Paisley's testimony would support plaintiff's case.

**14.** Indeed, this apparently is precisely how Carroll interpreted Assistant Secretary Paisley's statements. Carroll testified that his understanding at the time of this meeting with Assistant Secretary Paisley was as follows:

My understanding is had the Navy left space and weight on the first ship and [Assistant] Secretary Paisley not gotten into the trouble and had the system been allowed to get through testing and worked, then—and had his projection been right that they would

During the November 7, 1985, meeting, Assistant Secretary Paisley clearly encouraged Solar to continue RACER testing, but this encouragement was conditioned on Solar believing it could produce a successful product. Assistant Secretary Paisley told Carroll that "[i]f you really believe that [RACER] is a good system, then once you get it on a ship ... and we test it and if it works that well, you won't build them fast enough, that the Navy will wind up buying a lot of systems." Assistant Secretary Paisley responded to Carroll's concerns about Admiral Altwegg and others not wanting to return steam to ships by noting that it had always been his position to continue RACER development and install a RACER system on the DDG–X class ships, and the only issue was whether it would be on the first ship, the DDG–51, or on some later ship of the DDG–X class. It is not apparent that this statement is inconsistent with Assistant Secretary Paisley's historic beliefs. Indeed, this position seems both reasonable and practical given Congress' constant, forceful, and, up to then, effective, pressure to oblige the Navy to include RACER on the DDG–51. Each action the Navy had taken to postpone the redesign of the DDG–X had been met with an increasingly forceful response by Congress until Congress finally fenced all of the funds for the entire DDG–X project.

During the November 7, 1985, meeting Assistant Secretary Paisley also explained away the reluctance of some other Navy personnel to install a RACER system on any Navy ship by stating that he had seen a number of programs that Navy personnel did not seem to want, but that once the product went into the fleet and was successful, the "Navy loved it." But, again, there is no evidence that this statement misstates Assistant Secretary Paisley's actual experience and, in addition, the statement rings true. Presumably every Navy official, including Admiral Metcalf and Assistant Secretary Paisley, simply wanted to build the best Navy ships possible. If Solar, or anyone else, could produce a product

that worked and yielded important net benefits, it is reasonable to believe that all Navy officials would have evaluated the product on its merits and supported its use. Indeed, Admiral Metcalf did not want RACER on DDG–X class ships, not because of any animus toward Solar or any hesitation to try new technologies, but rather because he had concluded, based on his experience, that the problems detected during RACER testing were so significant that a RACER system could not be made viable for combat ships. It would have been reasonable for Assistant Secretary Paisley to predict that if Admiral Metcalf were proved wrong and the RACER problems, including noise and complexity, were resolved, that Admiral Metcalf ultimately would have embraced the RACER technology.

To support its contention that Assistant Secretary Paisley's statements at the November 7, 1985, meeting were false and intended to mislead Solar, plaintiff points to a summary prepared by Admiral Metcalf of a November 12, 1985, meeting of Assistant Secretary Paisley, Admiral Metcalf, and other Navy officials. Therein, Admiral Metcalf stated:

> MET WITH PAISLEY. HE MET WITH SOLAR AND HAS TALKED WITH BATTISTA.
>
> HE WOULD LIKE TO BE ABLE TO SAY THAT THE NAVY IS GOING TO PUT IT ON A SHIP, ANY SHIP. APPARENTLY THAT IS WHAT WOULD SIT BEST WITH TONY [BATTISTA]. THE STRATEGY THAT PAISLEY WOULD LIKE TO FOLLOW:
>
> FIND A SHIP. I PROPOSED THE AOE=6. TELL THE CONGRESS AND SOLAR THAT IF THE RACER PROVES OUT WE WILL PUT IT IN A "SHIP."
>
> TELL SOLAR TO COMPLETE THE TESTING AND GIVE US WHAT WE HAVE CONTRACTED FOR. (THIS WILL TAKE COMPANY MONEY AND IT IS NOT AT ALL CERTAIN THAT SOLAR WILL TAKE THE BAIT.)

have fallen in love with it, we would have sold a lot of them to the Navy. That was our

belief.

WHAT I NEED FROM YOU ASAP IS THE FEASIBILITY OF PUTTING A RACER IN AOE=6. I THINK THAT WE ARE PLANNING ON THIS SHIP BEING GAS TURBINE POWERED, WHICH MEANS IT OUGHT TO WORK. IN FACT, WITH THAT SIZE SHIP WE PROBABLY OUGHT TO PUT ONE ON EACH SHAFT IF WE ARE GOING TO DO IT AT ALL.

But this shift in focus from the DDG–X class ships to the use of RACER on another ship does not mean that Assistant Secretary Paisley's November 7, 1985, statements about RACER and the DDG–X class ships were false at the time they were made. During the November 7 meeting, Assistant Secretary Paisley, in effect, had made a prediction about future RACER sales if RACER tested out satisfactorily. The plan adopted by Assistant Secretary Paisley during the November 12 meeting is not inconsistent with that prediction. The Navy first had to address the pressing problem that Congress, through Battista, was pressuring the Navy to proceed *immediately* with the redesign of the DDG–51 to make it RACER compatible. The approach Assistant Secretary Paisley authorized during the November 12 meeting, after a conversation with Battista, seems to be addressed at getting Battista to remove that pressure. Moreover, the use of RACER on a different Navy ship was consistent with Admiral Metcalf's discussion with Carroll and also potentially consistent with Assistant Secretary Paisley's prediction to the effect that if RACER tests out satisfactorily, Solar would be able to sell many RACER units to the Navy.

In arguing for a broader, more skeptical interpretation of this summary, plaintiff focuses on the statement: "Tell Solar to complete the testing and give us what we have contracted for. (This will take company money and it is not at all certain that Solar will take the bait.)" As to the first sentence, there is nothing improper with the Navy asking Solar to perform the work that Solar had agreed to perform in the contract. As to the second sentence, the notion of laying out "bait" for someone certainly has pejorative connotations. But

in the context of all of the other evidence, this statement appears simply to reflect the Navy's concern that since Solar would be spending its own money for testing, Solar may not be willing to relinquish the leverage it had as a result of Secretary Lehman's certification that the DDG–51 would be "capable of being equipped with a [RACER] system." Admiral Metcalf apparently was expressing the concern that Solar may not find the proposal to use RACER on another ship satisfactory and as a result lobby Battista to continue to insist on the immediate redesign of the DDG–51. But with respect specifically to the "bait," *i.e.,* the proposal to use RACER on another ship, the summary does not suggest that the Navy should make false statements or otherwise deal with Solar dishonestly. Indeed, the summary reflects Admiral Metcalf's view that RACER could be viable on the AOE–6 ("it ought to work"), and indeed that more than one RACER system possibly would be needed for each AOE–6 constructed.

Next, the Navy's undertaking of a lobbying effort which resulted in the December 19, 1985, Conference Report similarly does not indicate that Admiral Metcalf or Assistant Secretary Paisley's statements at their respective meetings had been false or intentionally misleading. Admiral Metcalf had made very clear that he did not want RACER on the DDG–X and the lobbying effort was fully consistent with that position. As to Assistant Secretary Paisley, he had never said that it was his position that RACER should be included on the first flight of the DDG–X. The Conference Report only provided that the Navy discontinue plans for installation of RACER on the lead ship. The Navy was to "continue development of RACER installation plans for future Navy ship construction programs." This left open the possibility of RACER's use on the second flight of the DDG–X.

Plaintiff's allegations that the Navy treated Solar improperly is not limited to the actions of Admiral Metcalf and Assistant Secretary Paisley or to Navy actions taken prior to the December 19, 1985, publication of the Conference Report delinking

RACER and the DDG–51. For example, plaintiff faults Admirals Shaw and Rowden for continuing to encourage Solar's investment in RACER even after publication of the Conference Report and for failing to keep Solar apprised of the progress of an ECP. As to Admiral Shaw's alleged encouragement, as described above, after Carroll met with Admiral Shaw during the first week of January 1986, Carroll became concerned that the Navy did not want RACER and, as a result, ordered testing slowed down. Hence, it appears Carroll was discouraged rather than encouraged by Admiral Shaw's representations. Plaintiff also faults Admiral Rowden for encouraging Solar in his January 31, 1986, letter which, in effect, indicated the Navy's possible flexibility with respect to the $55 million contract cap in that the Navy might assume some additional costs for testing. But the letter, in essence, encouraged continuation of the negotiations that Solar had proposed into possible changes in the contract. Such changes were certainly worthy of consideration because the Navy was still actively considering RACER's possible use on Navy ships.[15] Moreover, there remained open the possibility that Congress would insist on RACER's use in the second flight of the DDG–X. Indeed, on July 25, 1986, a bill was introduced in the House of Representatives which seemed to be directed toward achieving this ultimate end.

Next, plaintiff also faults Admirals Shaw and Rowden for failing to indicate what action the Navy was considering with respect to an ECP after the December 19, 1985, publication of the Conference Report. But it was not until February 21, 1986, that Assistant Secretary Pyatt concurred in Admiral Rowden's proposal not to proceed with implementing an ECP, and by that time, the battle lines were beginning to be drawn. For example, Solar had already informed the Navy that it considered the $55 million cap unenforceable, and on February 25, 1986, Admiral Rowden responded with a letter that unequivocally stated the Navy's intent to enforce the cap and not to pay plaintiff anything above $55 million. In a March 5, 1986, response, Solar again stressed its position that the $55 million cap was unenforceable, indicated that Solar was seeking an equitable adjustment, and explained that while Solar purportedly was continuing with contract performance, it had decided to discontinue all testing of the first two RACER prototypes. Given this adversarial, prenegotiation, possibly prelitigation setting, the court cannot read much significance into the Navy's failure to volunteer the information to Solar that the Navy had decided not to implement an ECP at that time.

The court has reviewed all of the extensive evidence presented at trial, and while there are documents and testimony that raise some concern in the court's mind about the actions taken by Navy officials, ultimately, the court concludes that a much more benign interpretation of the RACER Strategy and Navy actions is warranted than plaintiff proposes. The Navy did not decide against the use of a RACER system on all Navy ships and did not undertake the proposed multifaceted effort to "kill" the RACER program which plaintiff alleges. While Navy officials encouraged Solar to fund RACER testing, they did not deal with Solar in bad faith and did not misrepresent any material facts.

## X.

Next, the court will proceed to address the remaining individual counts of the complaint. To prevail in this action, plaintiff, in some way, must render unenforceable

**15.** Plaintiff focuses on a handwritten January 13, 1986, cover memorandum to a draft of Admiral Rowden's January 31, 1986, letter in which Admiral Shaw states to Admiral Rowden that "Solar is losing money on RACER. [The Navy money for testing offered in the draft letter] will just make their losses less. We hope Caterpillar will kill the program." Admiral Shaw testified that this reference to Caterpillar was an intemperate statement made out of frustration and referred to the hope of individuals in the AEGIS shipbuilding program who had been so concerned about congressional pressure to include space and weight on the DDG–51. The court is not convinced that this memorandum has broader meaning so as to confirm plaintiff's contention that the Navy had formulated the comprehensive strategy plaintiff proposes.

the express $55 million limitation on Navy payments contained in clause H–20 of the P00037 modification. In only one of the counts (Count IX, which alleges improper termination for convenience) does plaintiff, in effect, seek the voiding of the $55 million cap on the grounds that the Navy violated an express provision of the contract. Each other count is based upon a different legal doctrine which, in effect, establishes obligations on parties to a contract that are not expressly contained in the contract. For each count, plaintiff contends that application of the applicable doctrine to the facts of this case mandates the conclusion that defendant breached its contractual obligations and as a result, the $55 million cap should not be enforced. The court will consider plaintiff's arguments as to the application of each doctrine in the order in which plaintiff presents its arguments in its post-trial brief.

## XI.

██ In Count IV, plaintiff contends that the $55 million cap to which the parties agreed in the P00037 modification is not enforceable because Navy officials misrepresented material facts to plaintiff. Proof that a party to a written contract misrepresented material facts potentially can be the basis for a court holding that the contract was never formed, the contract was formed but is void, or the contract was formed but its terms should be reformed. *See Restatement (Second) of Contracts*, §§ 163, 164, and 166 (1981) (hereinafter *Restatement*). Any of these results would involve an exception to the ordinary rule that the express terms of a contract, as bargained for

by the parties, are controlling. The reason for this exception is that where assent to a contract is induced by misrepresentation, the bargaining process has been impaired and the express contract provisions do not necessarily reflect the agreement between the parties.[16]

██ Here, plaintiff seeks reformation of the contract in that it asks the court to modify the express contract terms. Plaintiff asks the court to enforce all other contract provisions but to read out of the contract the provision establishing the $55 million cap on Navy payments under the contract. In evaluating a request for such reformation, it is appropriate to apply the applicable standards for reformation set forth in Section 166 of the *Restatement*. Thereunder, to secure reformation of a contract, a party to the contract must establish, *inter alia*, (1) a misrepresentation, *i.e.*, an assertion that is not in accord with the facts (*see Restatement* § 159), (2) that the misrepresentation was fraudulent (*see Restatement* § 162), (3) that the misrepresentation induced the party to assent to the contract (or contract modification) (*see Restatement* § 162), and (4) that the party was justified in relying on the misrepresentation (*see Restatement* § 166).[17]

██ The alleged misrepresentations by Navy officials that plaintiff identifies here as rendering the $55 million cap unenforceable relate to plaintiff's version of the RACER Strategy. In its post-trial brief, plaintiff relies principally on the following alleged misrepresentations: (1) that the Navy intended to install a RACER system on the DDG–51 and the rest of the DDG–X class if the system tested satisfactorily; (2)

**16.** The introductory note in Chapter 7 of the *Restatement* explains this point as follows:

Contract law has traditionally relied in large part on the premise that the parties should be able to make legally enforceable agreements on their own terms, freely arrived at by the process of bargaining. This premise presupposes that the integrity of the bargaining process has not been impaired by misrepresentation, duress or undue influence.

**17.** Section 166 of the *Restatement* states, in pertinent part:

When a Misrepresentation as to a Writing Justifies Reformation

If a party's manifestation of assent is induced by the other party's fraudulent misrepresentation as to the contents or effect of a writing evidencing or embodying in whole or in part an agreement, the court at the request of the recipient may reform the writing to express the terms of the agreement as asserted,

(a) if the recipient was justified in relying on the misrepresentation, and

(b) except to the extent that rights of third parties such as good faith purchasers for value will be unfairly affected.

that the Navy would install a RACER system on another class of auxiliary ships if not the DDG–X class; (3) that the Navy was proceeding with an ECP to provide space and weight for a RACER system on the DDG–51; (4) that Solar had to complete testing of the RACER system by January 1986 in order to meet a "forward-fit" construction schedule for the DDG–51; and (5) that Solar should spend its own money above the $55 million cap on completing the RACER system because Solar would sell many RACER units to the Navy.[18]

In Sections VIII and IX, *supra*, the court addressed at length the RACER Strategy and the actions of Navy officials and concluded that the Navy had not made a final decision not to install a RACER system on any DDG–X class ship, much less on any ship in the Navy fleet. Based primarily on the court's findings and discussions above, the court concludes that plaintiff has not demonstrated that the pertinent representations made by certain Navy officials were false, much less fraudulent. In addition, plaintiff's proof as to misrepresentation focuses primarily on Navy actions and determinations made after the April 19, 1985, P00037 modification, which contained the $55 million cap on government liability. Such post-modification representations cannot serve as a basis for reforming the contract so as to eliminate the $55 million cap because these representations could

not possibly have induced plaintiff to agree to the cap.[19]

## XII.

Next, in Count I, plaintiff also seeks relief from the $55 million cap on the ground that the Navy had failed to disclose "superior knowledge" to plaintiff. The government's failure to disclose superior knowledge can, in certain narrowly defined circumstances, result in a breach of contract which can serve in effect to relieve a contractor from the express terms of the contract. *See, e.g., GAF Corp. v. United States*, 932 F.2d 947 (Fed.Cir.1991), *cert. denied*, — U.S. ——, 112 S.Ct. 965, 117 L.Ed.2d 131 (1992). But, as was true with plaintiff's misrepresentation theory, plaintiff has not established the prerequisites to prevail on a theory of failure to disclose superior knowledge.

The superior knowledge plaintiff alleges the Navy failed to disclose relates to plaintiff's allegation that the RACER Strategy was directed at appeasing Battista while at the same time assuring that a RACER system would never be used on any Navy ship.[20] But, as described above, plaintiff has failed to prove that its version of the RACER Strategy ever existed. The Navy never made a final decision not to use RACER on any ship. Rather, the Navy encouraged Solar to complete RACER testing because the Navy wanted to evaluate

18. With Count IV, as with the other remaining counts, there is a significant variation between the facts plaintiff alleges in its complaint and the facts plaintiff alleges in its post-trial brief. This variation apparently is the result of plaintiff modifying its approach after it filed its complaint based on the evidence it uncovered during discovery. When considering Count IV as well as the other remaining counts, the court will focus primarily on the allegations upon which plaintiff relies in its post-trial brief. Presumably, these allegations are those upon which plaintiff ultimately chose to rely. In any event, the court has considered each of the factual allegations in both plaintiff's complaint and its post-trial brief and concludes that plaintiff is not entitled to judgment on any count.

19. Defendant contends that plaintiff's allegation of misrepresentation sounds in tort and, hence, falls outside of this court's jurisdiction. But the fact that there is a tortious aspect to a misrepresentation claim does not mean that a contract

claim does not also exist. *See Wood v. United States*, 961 F.2d 195 (Fed.Cir.1992). If the pertinent prerequisites set forth in the *Restatement* for a contract remedy are present, such a contract remedy should be available in a contract action in this court.

20. In its post-trial brief, plaintiff alleges that the Navy failed to disclose, *inter alia*, that (1) the Navy did not want and did not intend to install a RACER system on any Navy ship, (2) the RACER Strategy existed, (3) the Navy was encouraging Solar to continue RACER development only to appéase Battista, (4) the Navy hoped Solar's RACER test program would fail, (5) the Navy intended to "kill" the RACER program even if Solar's testing succeeded, (6) the Navy intended to decouple RACER and "kill" the ECP and thus eliminate any chance that the Navy would deploy RACER units on its fleet, and (7) the Navy had decided to cancel the ECP and its production plan for RACER.

the RACER system and determine whether it should be installed on some Navy ship. Since the "superior knowledge" upon which plaintiff relies never existed, no proper claim can lie based on a failure to disclose that knowledge.

In any event, however, the duty to disclose superior knowledge as defined in case law would not seem to encompass the type of knowledge plaintiff alleges the Navy failed to disclose here. The duty to disclose superior knowledge arises typically in situations where the government has vital information relating to the cost of performing the work described in the contract specifications, and the contract specifications either mislead the contractor as to the cost of that work or, in the alternative, fail to put the contractor on notice to inquire as to the existence of the knowledge. *Petrochem Services, Inc. v. United States*, 837 F.2d 1076 (Fed.Cir.1988) (government allegedly withheld estimates as to the actual quantity of spilled oil to be cleaned up under the contract); *American Ship Bldg. Co. v. United States*, 228 Ct.Cl. 220, 654 F.2d 75 (1981) (government allegedly withheld knowledge of overruns and delays occurring in similar earlier contracts); *Petrofsky v. United States*, 222 Ct.Cl. 450, 616 F.2d 494 (1980), *cert. denied*, 450 U.S. 968, 101 S.Ct. 1488, 67 L.Ed.2d 618 (1981) (government allegedly withheld knowledge concerning access to and loading capacity of contract sites). In *GAF Corp.*, 932 F.2d at 949, the Court of Appeals for the Federal Circuit, quoting *Lopez v. A.C. & S., Inc.*, 858 F.2d 712, 717 (Fed.Cir.1988), *cert. denied*, 491 U.S. 904, 109 S.Ct. 3185, 105 L.Ed.2d 694 (1989), summarized the four prerequisites for application of the "superior knowledge" doctrine, as follows:

> This "superior knowledge" doctrine can, in limited circumstances, supply the basis for a breach of contract. To show a breach under the superior knowledge doctrine, a contractor claiming a breach by non-disclosure must produce specific evidence that it

> (1) undert[ook] to perform without vital knowledge of a fact that affects performance costs or direction, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire, and (4) the government failed to provide the relevant information.

*Lopez*, 858 F.2d at 717 (citing *American Ship Bldg. Co. v. United States*, 228 Ct.Cl. 220, 654 F.2d 75 (1981)). 932 F.2d at 949.

Here, plaintiff has failed to establish these prerequisites with respect to the information it alleges the Navy withheld. The work to be performed under the contract involved the design, development, and fabrication of three RACER prototypes, but the knowledge the Navy allegedly withheld related to the Navy's intent to enter distinct future contracts for the production of RACER units for on-ship installation. Rather than plaintiff having no reason to obtain information as to the Navy's intent to make such future purchases of RACER units (prerequisite (2) in *GAF*), plaintiff recognized the significance of such information and inquired repeatedly about the government's intentions. Moreover, the contract specifications certainly did not mislead plaintiff as to the likelihood of the Navy entering such future contracts or fail to put plaintiff on notice to inquire (prerequisite (3) in *GAF*). The contract simply provided the Navy with an unpriced option to have plaintiff design and manufacture two additional units and left the determination of whether to exercise that option and purchase those units completely up to the Navy.[21] At its essence, plaintiff's claim is not that the Navy or the contract specifications failed to suggest the existence of information about which the contractor had no reason to inquire, but rather that plaintiff raised the underlying issue repeatedly but was led astray by the Navy's response.

---

**21.** Indeed, the contract provided that it was the government's intent that after the two additional units, all future RACER production units would be subject to competitive procurement.

The doctrine of "superior knowledge" simply does not reach such a claim.

### XIII.

■ Next, in Count V, plaintiff contends that the $55 million cap should not be enforced because the Navy breached a warranty the Navy had made to plaintiff. Plaintiff describes that warranty as follows: "Admiral Metcalf and [Assistant] Secretary Paisley assured [Solar] that the Navy's present intention was to use RACER and install it on Navy ships if [Solar] spent the money to make it work."

First, even assuming the statements by Admiral Metcalf and Assistant Secretary Paisley constituted a warranty, plaintiff has not demonstrated any breach of that warranty. As explained above, plaintiff did not demonstrate that Admiral Metcalf and Assistant Secretary Paisley's intentions were different than they had articulated during their pertinent meetings with Carroll.

Second, in any event, the timing of most of the statements upon which plaintiff relies creates a problem for plaintiff. In *Everett Plywood & Door Corp. v. United States*, 190 Ct.Cl. 80, 88–89, 419 F.2d 425, 429 (1969), the Court of Claims concluded that it was appropriate to evaluate the warranty claim therein under Section 2–313 of the Uniform Commercial Code. Thereunder, an affirmation of fact can create a warranty only where the affirmation is "part of the basis of the bargain" in that it was made in the course of negotiating the agreement or a modification to the agreement.[22] Apparently all of the pertinent statements by Admiral Metcalf and most of the statements by Assistant Secretary Paisley were made after completion of the negotiations and adoption of the $55 million cap and therefore could not have been "part of the basis of the bargain." While Section 2–313 creates warranties only for sellers of goods and therefore does not directly control the instant case, to the extent that affirmations of fact by government officials who are *purchasers* of goods or services potentially can result in a warranty, there is no sound reason not to apply the same "part of the basis of the bargain" requirement contained in Section 2–313.[23] Again, absent some compelling rationale for acting otherwise, the court is obliged to enforce the express terms of the contract as bargained for by the parties.

### XIV.

■ Next, in Count VIII, plaintiff contends that the $55 million cap should not be enforced because the Navy breached its implied contractual obligation to act in good faith during the course of the performance of the contract. Section 205 of the *Restatement* provides that "[e]very con-

---

**22.** Section 2–313:10 of the Uniform Commercial Code (1970) states:

From the fact that the criterion of the existence of an express warranty is that it is part of the basis of the bargain, it is apparent that by definition the statement which is alleged to constitute the express warranty must have been made during the time of the making of the contract. A statement made after agreement has been reached is not an express warranty even though neither the buyer nor the seller had yet performed the contract.

**23.** With respect to Count IV (misrepresentation), Count I (withholding superior knowledge), and Count V (breach of warranty), in addition to presenting a defense on the merits, defendant, relying on *Ling–Tempco–Vought, Inc. v. United States*, 201 Ct.Cl. 135, 475 F.2d 630 (1973) (*LTV*), presents the affirmative defenses of estoppel, waiver, and election. However, *LTV* is not on point because, unlike in *LTV*, the Navy herein did not prove that during the peri-

od of contractor-funded performance, the contractor had actual knowledge of the very Navy conduct that it later alleged constituted the actionable breach of contract. Indeed, it was not until pretrial discovery that plaintiff uncovered the RACER Strategy and other internal Navy memoranda that presently form the factual basis of plaintiff's contention that the Navy breached the contract by inducing plaintiff to continue its investment in RACER development.

It is possible, nevertheless, that at some point in time, perhaps after the December 19, 1985, publication of the Conference Report, plaintiff's knowledge of the Navy's intentions with respect to RACER development was sufficiently clear that any expenditures by plaintiff thereafter should not be recoverable on a waiver, an estoppel, or an election theory. But the parties' post-trial briefs do not focus on this narrow question and given this court's conclusion that no breach occurred, the court will not address this issue any further.

tract imposes on each party a duty of good faith and fair dealing in its performance and its enforcement." In its May 14, 1991, opinion, this court held that such a duty is properly implied in federal government contracts. *Solar*, 23 Cl.Ct. at 156. However, while this duty exists, it must be applied with great care. "[T]he essence of a bargain between parties to a contract is found in the express provisions of that contract. The implied duty to deal in good faith, therefore, must not be interpreted so broadly as to inhibit a party from maximizing its benefits through aggressive enforcement of its contract rights." *Id.*

Plaintiff's contention that the Navy failed to deal in good faith rests on the same allegations discussed above, *inter alia,* that Navy officials adopted and pursued a strategy aimed at depriving Solar of its negotiated-for right to terminate the contract without liability once it reached the $55 million cap on government payments. Plaintiff specifically contends that Assistant Secretary Paisley acted in bad faith when he insisted that Solar meet both the construction schedule for the DDG–51 and the contractual January 31, 1986, testing deadline even though the Navy had no intention of placing a RACER system on the DDG–51.

The court has addressed these contentions at length above. For the reasons previously set forth, the court does not agree with plaintiff's characterization of the RACER Strategy or of Carroll's meetings with Admiral Metcalf and Assistant Secretary Paisley. Plaintiff has not demonstrated that Admiral Metcalf, Assistant Secretary Paisley, or any other Navy official failed to act in good faith.

## XV.

■ Count VII, which rests on equitable estoppel, is deficient for the same basic failure of proof. Equitable estoppel is an equitable doctrine which potentially can be invoked when one party to a contract relies to its detriment on representations or a course of conduct by the other party. When equitable estoppel applies, the party who made the representation or engaged in the course of conduct potentially may be estopped from relying on an express term in the contract that otherwise would place a limit on that party's financial liability. *See, e.g., American Electronic Laboratories, Inc. v. United States,* 774 F.2d 1110, 1113–16 (Fed.Cir.1985).

It is an open question as to whether equitable estoppel will ever lie against the federal government. *See OPM v. Richmond,* 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990). However, to the extent that equitable estoppel does lie, the contractor must prove the following: (1) the government knew the pertinent facts; (2) the contractor did not know the pertinent facts; (3) the government engaged in conduct or made representations that either were intended to induce specific conduct by the contractor or that reasonably could be interpreted by the contractor as inducing such specific conduct; (4) the contractor relied upon the government's conduct or representations, was induced to engage in such specific conduct, and suffered injury; and (5) the conduct or representations by the government was, or were, carried out by government representatives acting within the scope of their authority. *Emeco Industries, Inc. v. United States,* 202 Ct. Cl. 1006, 1015, 485 F.2d 652, 657 (1973); *American Electronic Laboratories,* 774 F.2d at 1113.

Plaintiff has not satisfied these prerequisites. The pertinent fact that plaintiff alleges the government knew but the contractor did not was that the Navy did not intend to install a RACER system on the DDG–X class ships or any other Navy ship. But, as explained above, plaintiff has failed to prove that the Navy had established such an intent.

## XVI.

■ Next, turning to Count IX, plaintiff challenges the contracting officer's May 8, 1986, termination of the contract for the convenience of the government. The contract permits such termination "whenever for any reason the Contracting Officer shall determine that such termination is in the best interest of the Government." This

wording gives the contracting officer broad discretion "and in the absence of bad faith or clear abuse of discretion the contracting officer's election to terminate is conclusive." *John Reiner & Co. v. United States*, 163 Ct.Cl. 381, 390, 325 F.2d 438, 442 (1963), *cert. denied*, 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964).

Plaintiff contends that the contracting officer never made the required finding that termination was in the government's best interest and therefore that the termination was in violation of the express contract terms. But the contracting officer credibly testified that prior to terminating the contract, he had made a determination that such action was in the best interest of the government. His reasons included that (1) the RACER program was in trouble technically, (2) the RACER program did not appear to be cost beneficial, and (3) the "Assistant Secretary and the Program Office in charge of the program had concluded that they wanted to terminate the contract."

Plaintiff did not establish at trial that the contracting officer's determination of the government's best interest either was made in bad faith or constituted a clear abuse of discretion.[24] As to alleged bad faith, to the extent that plaintiff contends termination was the last and final act of a bad faith Navy strategy aimed at terminating the RACER program, as explained above, plaintiff simply has failed to establish the existence of such a strategy. Moreover, in *Kalvar Corp. v. United States*, 211 Ct.Cl. 192, 199, 543 F.2d 1298, 1302 (1976), the Court of Claims indicated that to demonstrate bad faith termination the contractor must demonstrate that termination was undertaken with the specific

intent to injure it. Plaintiff has made no such showing here.

Next, the court also cannot conclude that the contracting officer's decision that termination of the contract was in the best interest of the government constituted a clear abuse of discretion.[25] First, as to the contracting officer's concern that the RACER program may be in trouble technically, the technical problems that had arisen during testing had not been completely resolved. The 100–hour test run directed at determining reliability and maintainability had been completed but it was the opinion at NAVSSES that the test was not conducted satisfactorily and there were three significant problems, including noise, for which there were no "quick fixes." Moreover, further work under the contract aimed at addressing these technical problems was not progressing satisfactorily. Solar had sent a stop-work order to NAVSSES on January 21, 1986. Carroll, in effect, countermanded that order a few days later, but Solar's work at NAVSSES dropped off dramatically thereafter to a virtual abandonment of testing. It became apparent that the delivery of the third prototype would not occur in time for the scheduled at-sea testing.

Next, as to the cost benefits of the RACER program, a study by the Center for Naval Analysis indicated that RACER would not be as cost effective as earlier had been envisioned. Moreover, despite the $55 million cap, the Navy was continuing to incur costs related to the contract, including costs associated with the at-sea test ship and various Navy personnel involved with the RACER program.

After the December 19, 1985, Conference Report, the parties began negotiations relating to possible changes in the contract

---

**24.** Contrary to plaintiff's assumption, even if plaintiff did prove that the termination for convenience was improper, it is not apparent that plaintiff would be entitled to recover all of its costs under the contract. The contract contained a $55 million limitation on government payments and plaintiff has not explained under what legal theory a finding of an improper termination would oblige this court to void that cap and award plaintiff recovery of all costs expended prior to termination.

**25.** The contracting officer did not have personal knowledge of the technical difficulties associated with the RACER program but the contracting officer can reasonably rely upon the opinions and statements of other Navy officials when making a determination of the best interest of the government. *Salsbury v. United States*, 17 Cl.Ct. 47, 56 (1989), *aff'd*, 905 F.2d 1518 (1990).

terms and these negotiations evolved into negotiations for mutual termination of the contract. Admiral Metcalf and others apparently favored paying Solar for all its reasonable costs above the $55 million cap but ultimately the Navy decided to enforce the contract as written and not pay any funds above that cap. In all of the discussions between the parties subsequent to the December 19, 1985, publication of the Conference Report, Solar sought significant additional funds or guarantees of future RACER purchases. Therefore, at this point in time, the Navy reasonably had to make a determination as to whether it wanted to make significant additional investments of its own money in RACER development and testing. The Navy had already made a $55 million investment and it is not obvious to this court that termination for convenience of the government at that point necessarily was the most appropriate decision. It appears that the technical problems potentially could have been solvable so that a RACER system useable on some Navy ship might have been developed. But much work, testing, and investment remained and based upon the totality of the evidence, the court simply cannot conclude that the contracting officer's decision to terminate the contract, based in part on recommendations from other Navy officials, constituted a clear abuse of the discretion allowed the Navy in its procurement decisions.

### XVII.

In summary, plaintiff had repeated warnings that investing in RACER could prove risky. The contract contained an express $55 million limitation on government liability and no obligation for the Navy to purchase any RACER units for installation on ships. Moreover, Solar was well aware that numerous individuals within the Navy, including the influential Admiral Metcalf, did not want to install a RACER system on DDG–X class ships. Solar also knew that there were frequent skirmishes between the Navy and Congress, with the Navy resisting Congress' effort to force the Navy to install RACER on the first flight of the DDG–X. In addition, Battista had warned Solar that "elephants" were fighting (*i.e.*, Congress and the Navy) and Solar could get "trampled."

Faced with these warnings, Solar, in effect, had various options under the express terms of the contract. Solar could have avoided any risk at all and simply requested that the Navy terminate the contract. Next, Solar could have informed the Navy that Solar would request such a termination unless the Navy agreed to modify the contract so as to provide either for increased payments by the Navy under the contract or a guarantee that the Navy would purchase RACER units in the future. But Solar chose neither of these two options and instead chose a third—to invest its own funds in RACER testing. Plaintiff has not established that its decision to choose this third option was the result of the Navy breaching any express or implied obligation that the Navy owed Solar under the contract. Since plaintiff has not established any breach of contract by the Navy, plaintiff is bound by the express $55 million cap on Navy liability. Consequently, plaintiff cannot recover any of its expenditures above that amount.

### Conclusion

For the reasons set forth above, defendant is granted judgment on all remaining counts of the complaint. The Clerk of the Court is directed to dismiss the complaint. No costs.

IT IS SO ORDERED.